[No. B183942. Second Dist., Div. Five. Sept. 12, 2006.]

PAULA NELSON, Plaintiff and Appellant, v.
INDEVUS PHARMACEUTICALS, INC., Defendant and Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of the part entitled *Collateral estoppel.*

**COUNSEL**

Hackard & Holt, Theodore J. Holt and Peter T. Holt for Plaintiff and Appellant.

Skadden, Arps, Slate, Meagher & Flom, Raoul D. Kennedy; and Katherine Armstrong for Defendant and Respondent.

**OPINION**

**ARMSTRONG, J.**—This lawsuit arises from plaintiff and appellant Paula Nelson's use of the prescription diet drug dexfenfluramine (sold as Redux), which was promoted and marketed by defendant and respondent Indevus Pharmaceuticals, Inc. Redux and a similar drug, Pondimin (both commonly known as "Fen-phen") were withdrawn from the market in September of 1997, on reports that they could cause valvular heart disease.

Nelson took Redux for about a month, starting in January of 1997, after she had taken other Fen-phen drugs for about nine months. She stopped taking Redux because she was not losing weight. She first contacted an attorney in June of 2002, after she saw the attorney's television advertisement, and first had an echocardiogram (the means by which valvular heart disease is diagnosed) in September of that year. In July 2003, as the result of the echocardiogram, Nelson filed this personal injury lawsuit.

Indevus moved for summary judgment on the ground that the complaint was barred by the statute of limitations, based in part on a theory of (to use its phrase) "constructive suspicion." Indevus contended that under California's discovery rule, the statute of limitations began to ran when the dangers of Fen-phen were publicized. Nelson argued to the contrary, that an actual suspicion of wrongdoing is required, relying on long-standing California law and on Code of Civil Procedure[1] section 340.8, and citing her testimony that before she saw the ad in June of 2002, she did not know that Fen-phen drugs

---

[1] All further statutory references are to that code.

could have caused her an injury. The trial court granted the motion and entered judgment for Indevus. We reverse.

## Discussion

### *"Constructive suspicion"*

Indevus's motion principally rested on its contention that under the discovery rule, the statute began to run when the danger of Fen-phen was publicized. That is, although it was undisputed for purposes of summary judgment that Nelson did not know about the danger of Fen-phen drugs before the spring of 2002,[2] Indevus argues that she should have known sooner, when, through newspaper articles, television news reports, and other means, the public in general was given information sufficient to arouse suspicion, and that "should have" is enough.[3]

In factual support, Indevus proffered evidence about the television and newspaper coverage which began in July 9, 1997, when the Mayo clinic reported a connection between Redux and other Fen-phen drugs and heart disease, and which continued after those drugs were withdrawn from the market and included coverage of Fen-phen litigation.[4] After the withdrawal, news reports often cautioned patients to "call your doctor" to check for heart problems. In addition, Indevus proffered evidence that when the drugs were withdrawn Wyeth, which also promoted and marketed Redux, sent letters to approximately 450,000 doctors and pharmacists informing them of the potential association of the drugs with heart valve damage and took out ads in unspecified newspapers informing patents of the drugs' withdrawal from the

---

[2] At her deposition, Nelson testified that before September 2002, no doctor had ever suggested that she get an echocardiogram. The television ad which caused her to call an attorney was the only advertisement she had ever seen concerning Fen-Phen use, lawsuits, or claims. Before she saw the ad, it had never occurred to her that she was at risk of having suffered an injury from diet drugs. She was not aware that the diet drugs had been pulled from the market until several months before her deposition, and had never received notification of that fact from the doctor who prescribed them or from anyone else.

[3] Thus, Indevus argues that (to misquote section 340.8, discussed later in this opinion) "Media reports regarding the hazardous material or toxic substance contamination . . ." will "constitute sufficient facts to put a reasonable person on inquiry notice that the injury or death was caused or contributed to by the wrongful act of another."

[4] The newspapers included USA Today, the Los Angeles Times, the Los Angeles Daily News, and the San Bernardino Sun. Nelson lived in Los Angeles when she took Redux, but moved to San Bernardino County later in 1997.

market.[5] Indevus also proffered evidence about the publicity and legal notices surrounding and concerning the November 1999 settlement of a federal court class action lawsuit against Wyeth[6] concerning those drugs.

Legally, Indevus relies on leading California discovery rule cases. For instance, Indevus quotes *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103 [245 Cal.Rptr. 658, 751 P.2d 923] (*Jolly*) for the proposition that under the discovery rule, the statute begins to run when the "the plaintiff suspects or *should suspect* that her injury was caused by wrongdoing . . ." (*Jolly, supra,* 44 Cal.3d at p. 1110, italics added), and cites *Sanchez v. South Hoover Hospital* (1976) 18 Cal.3d 93 [132 Cal.Rptr. 657, 553 P.2d 1129] for its reference to " 'presumptive' . . . knowledge," and a plaintiff's " 'opportunity to obtain knowledge from sources open to his investigation . . . .' " (*Id.* at p. 101, italics omitted.) Indevus concludes that under California law constructive suspicion is enough.

■ The quotes are accurate, but they distort the holding of the cases cited, and the conclusion Indevus draws is wrong. Our Supreme Court has never held that under the discovery rule, the suspicion necessary to trigger the statute may be imputed to a plaintiff, and we do not believe that to be the law. When the cases are read in whole, rather than in isolated quotes, it is clear that a plaintiff's duty to investigate does not begin until the plaintiff actually has a reason to investigate. "A plaintiff has reason to discover a cause of action when he or she 'has *reason* at least to suspect a factual basis for its elements.' [Citations.]" (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 807 [27 Cal.Rptr.3d 661, 110 P.3d 914], italics added.) "[W]e look to whether the plaintiffs have *reason* to at least suspect that a type of wrongdoing has injured them." (*Ibid.,* italics added.)

The statute of limitations does not begin to run when some members of the public have a suspicion of wrongdoing, but only "[o]nce the plaintiff *has* a suspicion of wrongdoing." (*Jolly, supra,* 44 Cal.3d at p. 1111, italics added.)

An examination of the cases Indevus cites reveals the flaws in its analysis.

---

[5] Those ads, like the press releases that Indevus sent out after Redux was withdrawn from the market, refer to "new, preliminary information regarding heart valve abnormalities."

[6] Indevus was a nonsettling defendant in that litigation. The federal judge who presided over the litigation found that an elaborate and extensive plan of notice was used to inform class members of the settlement, including a sophisticated advertising campaign which ran from November 1999 through February 2000, on television, on the Internet and in newspapers and magazines, informing Redux users that they might have heart valve problems and might be eligible for free medical care and for compensation.

*Jolly* was a DES (drug estrogen diethylstilbestrol) case. The plaintiff knew of the DES litigation and believed that DES had caused her injuries, and thus had a suspicion of wrongdoing. She did not file suit because she did not know who to sue, and the holding of *Jolly* is that the statute was triggered by the knowledge she did have. She was not held to generally available knowledge.

*Jolly* made the "should suspect" statement in its discussion of another case, *Kensinger v. Abbott Laboratories* (1985) 171 Cal.App.3d 376 [217 Cal.Rptr. 313]. *Kensinger* considered the rule that only ignorance of a "critical fact" can delay the running of the statute, and determined that wrongful conduct was a critical fact, so that "the statutory clock did not begin to tick until the plaintiff knew or reasonably should have known of the facts constituting wrongful conduct, as well as the fact of her injury and its relation to DES." (*Jolly, supra,* 44 Cal.3d at p. 1110.)

*Jolly* rejected that holding, and held instead that "A plaintiff need not be aware of the specific 'facts' necessary to establish the claim; that is a process contemplated by pretrial discovery. Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her." (*Jolly, supra,* 44 Cal.3d at p. 1111.)

*Sanchez v. South Hoover Hospital, supra,* 18 Cal.3d 93, is the same. In that medical malpractice case, the plaintiff had a long and difficult labor, a caesarean, a stillborn baby, and postsurgical complications. By the day of her hospital discharge she suspected that malpractice had caused the stillbirth and the complications. The case held that by the date of her discharge, "plaintiff had become alerted to the necessity for investigation and pursuit of her remedies," so that the statute began to run on that date. (*Id.* at p. 102.)

The principal issue on appeal concerned the doctors' duty of disclosure, and *Sanchez*'s reference to presumptive knowledge was in its discussion of the discovery rule. In *Gutierrez v. Mofid* (1985) 39 Cal.3d 892 [218 Cal.Rptr. 313, 705 P.2d 886], the Supreme Court summarized its holding in *Sanchez*: "The patient is charged with 'presumptive' knowledge of his negligent injury, and the statute commences to run, once he has ' "notice or information of circumstances to put a reasonable person *on inquiry,* or *has the opportunity to obtain knowledge* from sources open to his investigation . . . ." ' (*Sanchez* [v. *South Hoover Hospital*], *supra,* at p. 101, quoting 2 Witkin, Cal. Procedure (2d ed. 1970) Actions, § 339, p. 1181 [citing numerous cases], italics added

by *Sanchez.*) Thus, when the patient's 'reasonably founded suspicions [have been aroused],' and she has actually 'become alerted to the necessity for investigation and pursuit of her remedies,' the one-year period for suit begins. (18 Cal.3d at p. 102.)" (*Gutierrez v. Mofid, supra,* 39 Cal.3d at pp. 896–897.)

The Supreme Court recently restated the rule: "A plaintiff has reason to discover a cause of action when he or she 'has reason at least to suspect a factual basis for its elements.' [Citations.] . . . [¶] . . . [¶] In other words, plaintiffs are required to conduct a reasonable investigation after becoming aware of an injury, and are charged with knowledge of the information that would have been revealed by such an investigation." (*Fox v. Ethicon Endo-Surgery, Inc., supra,* 35 Cal.4th at pp. 807–808.)

■ Indevus's argument amounts to a contention that, having taken a prescription drug, Nelson had an obligation to read newspapers and watch television news and otherwise seek out news of dangerous side effects not disclosed by the prescribing doctor, or indeed by the drug manufacturer, and that if she failed in this obligation, she could lose her right to sue. We see no such obligation. Instead, "If a person becomes aware of facts which would make a reasonably prudent person suspicious, he or she has a duty to investigate further and is charged with knowledge of matters which would have been revealed by such an investigation." (*Mangini v. Aerojet-General Corp.* (1991) 230 Cal.App.3d 1125, 1150 [281 Cal.Rptr. 827].) A patient who *actually* learns of the dangerous side effects of a drug she has taken ignores her knowledge at her peril, but the law only requires an investigation when a plaintiff has a reason to investigate.

*Code of Civil Procedure section 340.8*

Our conclusion is bolstered by this statute, which provides that "In any civil action for injury or illness based upon exposure to a hazardous material or toxic substance, the time for commencement of the action shall be no later than either two years from the date of injury, or two years after the plaintiff becomes aware of, or reasonably should have become aware of, (1) an injury, (2) the physical cause of the injury, and (3) sufficient facts to put a reasonable person on inquiry notice that the injury was caused or contributed to by the wrongful act of another, whichever occurs later. [¶] . . . [¶] (2) Media reports regarding the hazardous material or toxic substance contamination do not, in and of themselves, constitute sufficient facts to put a reasonable person on inquiry notice that the injury or death was caused or contributed to by the wrongful act of another." (Code Civ. Proc., § 340.8, subds. (a), (c)(2).)

Indevus argues that the statute applies only to actions concerning environmental hazards, not to personal injury actions such as this one, which are governed solely by section 335.1. Nelson argues that section 340.8 is not limited to environmental hazards, but under its plain meaning applies to cases which allege personal injury caused by harmful chemicals.

■ We agree with Nelson. When we look to the clear language of the statute (*Phelps v. Stostad* (1997) 16 Cal.4th 23, 32 [65 Cal.Rptr.2d 360, 939 P.2d 760]) we see that it applies to "any" civil action "for injury or illness based upon exposure to a hazardous material or toxic substance." Nothing in the statute limits its provisions to environmental hazards, or provides that they do not apply to cases alleging injury from prescription drugs, and we cannot import such a provision into the law.[7]

Further, as Nelson argues, the Legislature has expressed its intent that the statute apply to actions concerning prescription drugs. The legislative intent is found in the chaptered bill, which states that "It is the intent of the Legislature to codify the rulings in Jolly v. Eli Lilly & Co. . . . 44 Cal.3d 1103, Norgart v. Upjohn Co. (1999) 21 Cal.4th 383 [87 Cal.Rptr.2d 453, 981 P.2d 79], and Clark v. Baxter HealthCare Corp. (2000) 83 Cal.App.4th 1048 [100 Cal.Rptr.2d 223], in subdivisions (a) and (b) of Section 340.8 of the Code of Civil Procedure, as set forth in this measure, and to disapprove the ruling McKelvey v. Boeing North American, Inc. (1999) 74 Cal.App.4th 151 [86 Cal.Rptr.2d 645], to the extent the ruling in McKelvey is inconsistent with paragraph (2) of subdivision (c) of Section 340.8 of the Code of Civil Procedure, as set forth in this measure." (Stats. 2003, ch. 873, § 2.)

Both *Jolly* and *Norgart* alleged injuries arising from prescription drugs. In *Jolly*, the plaintiff alleged that she was damaged by her mother's use of DES, and *Norgart* was a wrongful death suit which alleged that a prescription drug, Halcion, caused the decedent's suicide. *Jolly* held that, "Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her." (*Jolly, supra,* 44 Cal.3d at p. 1111.) *Norgart* applied that rule to wrongful death actions.

*Clark* concerned an allergy to latex gloves. It too applied the discovery rule, holding that, "[T]he plaintiff must be aware of her injury, its factual

---

[7] This may also be an action for personal injury under section 335.1, but that makes no difference.

cause, and sufficient facts to put her on inquiry notice of a negligent cause." (*Clark v. Baxter Healthcare Corp.*, *supra*, 83 Cal.App.4th at p. 1057.)

*McKelvey* was a personal injury case against Boeing, with allegations about groundwater contamination at the Southern California Rocketdyne facilities. The case reached the Court of Appeal on Boeing's successful statute of limitations demurrer. Boeing's position was, in part, that extensive publicity meant that the plaintiffs knew or as a matter of law could have with diligence discovered the facts essential to their cause of action. The court affirmed, finding that the complaints failed because they did not allege the time or manner of discovery. (*McKelvey v. Boeing North American, Inc.*, *supra*, 74 Cal.App.4th at p. 160.) The case includes a good deal of discussion about the publicity, noting that "the bottom line is that plaintiffs' amended (and proposed amended) complaints acknowledge the publicity surrounding Boeing's operation of the Rocketdyne facilities, yet nevertheless fail to explain how they managed to ignore those 'newspaper articles.' . . . *They do not allege that they did not read, hear or see the articles and broadcasts they admit were published.*" (*Id.* at p. 161.)

Thus, the statement of legislative intent can only be read as a rejection of the theory Indevus proposes here, that the statute of limitations begins to run when the effects of a drug are publicized, and not when an individual plaintiff has reason to suspect that she has been harmed.

### *Nelson's reasons to suspect/other evidence*

Indevus does make an argument under the discovery rule that is independent of any theory of constructive suspicion. The argument is that Nelson's symptoms were sufficient to give her a reason to investigate, triggering the statute, and that Nelson failed to show that she acted with diligence. These are the facts:

Nelson testified that she had several symptoms which she thought could have been caused by diet drugs: intermittent heart palpitations, fatigue, and dizziness. She testified that she began suffering those symptoms "in the late 1990s," and that she "really noticed them" after she stopped taking the diet drugs. Some of her medical records indicated that she had heart palpitations prior to taking the drugs, something she did not recall. Nelson also testified that she had been diagnosed with thyroid problems, and with GERD (gastroesophageal reflux disease), a gastrointestinal problem. She smoked, and had done so for 30 years, generally about a pack a day. She was five feet six inches tall, and at the time of her deposition weighed 180 pounds, and considered herself overweight.

She told a doctor, Dr. Vijay Wijeyakumar, about fatigue as soon as she began to suffer the fatigue, in the late 1990's. Dr. Wijeyakumar did not make a diagnosis. She also asked Dr. Wijeyakumar about palpitations, and asked her current doctor, Dr. Sood, about the palpitations and the fatigue. Neither doctor made a diagnosis. Nelson testified that she never asked a doctor whether those symptoms were related to Redux, and that no doctor had ever told her that these were symptoms of valvular heart disease or were connected to Fen-phen drugs.

We cannot see that symptoms as common and nonspecific as those Nelson suffered should, as a matter of law, have caused her to investigate the possibility that she had been harmed by Fen-phen drugs. The symptoms do not, in and of themselves, suggest a drug side effect, and Nelson did not begin to suffer them when she started the drugs, a scenario which would normally suggest that they were caused by the drugs. Indeed, medical records indicated that some of her symptoms may have predated her use of the drugs.

Further, the evidence is that Nelson did investigate the cause of her symptoms. She did not ask her doctors whether her symptoms could have been caused by Redux, but she did ask her doctors about the symptoms, apparently making some of the inquiries at a time when Indevus was selling the drug as a safe drug.

Finally, it is not clear that Nelson would have learned of the connection between her symptoms and Fen-phen even if she had read the newspaper articles and seen the television news stories Indevus cites. Few of the newspaper articles and television stories listed the symptoms of valvular heart injury. As Nelson argues, most of those articles and the ones which came later said only that patients should stop taking Fen-phen—Nelson had—and to see a doctor—which she did—not to get an echocardiogram and sue.

*Collateral estoppel*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[*]See footnote, *ante*, page 1202.

## Disposition

The judgment is reversed, as is the ruling on summary judgment. Appellant to recover costs on appeal.

Turner, P. J., and Kriegler, J., concurred.

A petition for a rehearing was denied October 6, 2006, and respondent's petition for review by the Supreme Court was denied November 29, 2006, S147468.