FILED

NOT FOR PUBLICATION

DEC 03 2012

UNITED STATES COURT OF APPEALS

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

FOR THE NINTH CIRCUIT

GINA SANTANGELO,

        Plaintiff - Appellant,

  and

BRANDON BOISCLAIR, a minor by and through his guardian Paul Boisclair,

        Plaintiff,

  v.

BRIDGESTONE/FIRESTONE, INC.,

        Defendant - Appellee,

  and

BRIDGESTONE CORPORATION,

        Defendant.

No. 10-56666

D.C. No. 2:01-cv-04210-CAS-MAN

MEMORANDUM[*]

Appeal from the United States District Court
for the Central District of California
Christina A. Snyder, District Judge, Presiding

_____

    [*]    This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36-3.

Argued and Submitted February 16, 2012
Pasadena, California

Before: PREGERSON and BEA, Circuit Judges, and PRATT, District Judge.[**]

Plaintiff-Appellant Gina Santangelo appeals the district court's judgment dismissing this case following a grant of Defendant-Appellee Bridgestone/Firestone, Inc.'s ("Firestone") motion for summary judgment. Firestone based its motion on the one-year statute of limitations for personal injury claims in California Code of Civil Procedure § 340(3) (West 1998), which the parties agree governs Santangelo's claims.[1]

Santangelo was injured on May 11, 1998, when the Ford Explorer driven by her mother overturned. The alleged cause of the accident was tread separation of the left rear tire, which had been manufactured by Firestone. Santangelo filed suit on May 2, 2001, nearly three years later. Santangelo contends her claim did not accrue and the limitations period did not begin to run until August 2000, when defects in Firestone tires were widely reported by the media.

---

[**] The Honorable Robert W. Pratt, District Judge for the U.S. District Court for Southern Iowa, sitting by designation.

[1] In 1998, California Code of Civil Procedure § 340(3) provided that actions for personal injury had to be brought within one year.

2

We have jurisdiction pursuant to 28 U.S.C. § 1291. We review *de novo* the district court's order granting a motion for summary judgment based on the statute of limitations. *Tucker v. Baxter Healthcare*, 158 F.3d 1046, 1049 (9th Cir. 1998). We affirm.

The question before us is when the statute of limitations began to run. Under California law, accrual of a cause of action, triggering the statute of limitations, generally begins "'when, under the substantive law, the wrongful act is done,' or the wrongful result occurs, and the consequent 'liability arises . . . .'" *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 397 (1999) (citations omitted). The delayed discovery doctrine, however, "postpones accrual . . . until the plaintiff discovers, or has reason to discover, the cause of action." *Id.* (citations omitted). A plaintiff "has reason to discover the cause of action when he has reason at least to *suspect* a factual basis for its elements." *Id.* at 398. (emphasis added) (citation omitted).

Santangelo hired her first set of attorneys within a week of the accident. The attorneys inquired into a California Highway Patrol accident report that mentioned the tire tread separation, had the vehicle and tires impounded for preservation, and engaged a tire failure analyst to inspect the tires to determine if the tread separation was the result of defective manufacturing. All of this occurred in June of 1998.

3

This is when Santangelo's attorneys first had knowledge of facts giving them reason to suspect the tire might be defective; thus it is when the statute of limitations began to accrue. Knowledge of these facts by Santangelo's attorneys is imputed to Santangelo because they were acting as her agent. *Lazzarevich v. Lazzarevich*, 39 Cal. 2d 48, 50, 244 P.2d 1 (1952).[2]

Appellant cites *Nelson v. Indevus Pharm., Inc.*, 142 Cal. App. 4th 1202, 1206 (Cal. Ct. App. 2006), for the proposition that a suspicion cannot be imputed to the litigant. In *Nelson*, the Court of Appeal held that the statute of limitations began to run when the plaintiff had a reason to discover her cause of action (when she saw an attorney's ad on television and had a test that revealed a defect in her heart valve), not from the time when the danger of the drug was first publicized to the public at large.[3]

---

[2] While the client is charged with the neglect of his or her attorney, the client is not without redress because in case of such wrongdoing the law provides the client with a remedy against the attorney. *Daley v. County of Butte*, 227 Cal. App. 2d 380, 391 (1964); *Hummel v. Hummel*, 161 Cal. App. 2d 272, 277, 326 P.2d 542 (1958). Thus, if Santangelo has any remedy at all, it would be against her original attorneys for malpractice.

[3] *Cal. Ins. Guar. Ass'n v. Workers' Comp. Appeals Bd.*, 163 Cal App 4th 853 (Cal. App. 2008), also cited by Santangelo, does not apply here. There, the Court of Appeal was interpreting specific Worker's Compensation statutes that deal with the accrual of a cause of action. No such statute applies here.

The key difference between *Nelson* and this case, which the dissent ignores, is that the general public had no duty to keep Nelson informed of facts that would give a reasonable person a reason to suspect she might have a cause of action. The general suspicion that the drug might cause heart problems was unknown to her, and no one was under a duty to tell her. Thus, the public's general suspicion could not be imputed to her.

Here, however, Santangelo's attorney did have a duty to keep his client informed of all relevant facts. He was acting as her agent. Thus, under *Lazzarevich*, we must impute Santangelo's attorney's knowledge of the facts which demonstrate he had a reason to suspect the tire was defective to Santangelo. *See also Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103 (Cal. 1988) (holding that a plaintiff who suspects wrongdoing but is unaware of any specific facts establishing wrongful conduct on the part of the defendant, may not delay bringing an action until she discovers such facts or their legal significance).

The fact that Santangelo, through her attorney, pursued an investigation into whether the tire was defective supports the conclusion that Santangelo's cause of

5

action began to accrue in June 1998, regardless of the ultimate fruits of that investigation.[4]

The district court also correctly held the fraudulent concealment doctrine does not apply because Sangtangelo was already on notice of her potential claim. "The doctrine of fraudulent concealment [for tolling the statute of limitations] does not come into play, whatever the lengths to which a defendant has gone to conceal the wrongs, if a plaintiff is on notice of a potential claim." *Rita M. Roman*

---

[4] Santangelo relies on *In re Bridgestone/Firestone, Inc.*, 200 F. Supp. 2d 983 (2002) (*Mancuso*). The plaintiffs in *Mancuso* did not hire an attorney and an expert to look into possible tire defects, and they did not preserve the tires for possible suit against the manufacturer. These facts distinguish Santangelo's case from *Mancuso*.

*Catholic Archbishop*, 187 Cal. App. 3d 1458, 1460 (1986); *accord California*

*Sansome Co. v. U.S. Gypsum*, 55 F.3d 1402, 1409 n.12 (9th Cir. 1995).[5]

 **AFFIRMED.**

---

 [5] Our decision that the fraudulent concealment doctrine does not apply here is supported by *Mark K. v. Roman Catholic Archbishop*, 67 Cal. App. 4th 63 (1998). There, several adult plaintiffs claiming to have been sexually abused as minors by clergyman sued the archdiocese, alleging the archdiocese was negligent in supervising and retaining the abusive clergy members, and fraud in a conspiracy to suppress relevant facts. The trial court consolidated the actions and sustained the archdiocese's demurrer, without leave to amend. The Court of Appeal affirmed, holding that: (1) the victims' allegations that they first became aware of certain facts related to the archdiocese's conduct in 1996 were insufficient to toll the applicable statutes of limitations; (2) the church's breach of duty occurred at time of abuse; (3) the victims' injuries resulting from the church's conduct were incurred at the time of the abuse; and (4) the applicable statutes of limitations were not tolled by reason of delayed accrual or estoppel by concealment. Here, Santangelo is not suing another entity for attempting to cover up Firestone's conduct. Rather she asserts that Firestone attempted to cover up its own negligence. But here, as in *Mark K.*, Santangelo knew of her injury the moment it happened, and she had reason to suspect the tire was defective as soon as her attorney obtained the police report, hired a tire analyst, and obtained the car and tires for inspection.

*Santangelo v. Bridgestone/Firestone, Inc.*, No. 10-56666

PREGERSON, Circuit Judge, dissenting:

I respectfully dissent. In affirming the district court's grant of Firestone's motion for summary judgment, the majority incorrectly ruled as a matter of law that California's one-year statute of limitations[1] began to run in June 1998 when Gina Santangelo's attorneys sent to a tire failure analyst the Firestone Radial ATX tires removed from Santangelo's mother's Ford Explorer. I believe that the statute of limitations began to run in August 2000. That is when Santangelo learned, through the national media, that Firestone decided to recall its Radial ATX tires.[2] It was only when that recall was publicized in the national media that Santangelo began to suspect that the accident, which killed her mother and brother and left her severely injured, was caused by a defect in the Firestone Radial ATX tires and not by her mother's unsafe right turn in reaction to the tire tread separation, as stated in

---

[1] On January 1, 2003, California Code of Civil Procedure § 335.1 went into effect, extending the statute of limitations for personal injury and wrongful death from one year to two years. Stats. 2002, ch. 448, §§ 2-3.

[2] On August 9, 2000, Firestone announced a recall of approximately 14.4 million Radial ATX, ATX II, and Wilderness AT tires, which were used as standard equipment on Ford Explorers. In December 2000, Firestone issued a report acknowledging design flaws and problems with the manufacturing process in the recalled tires.

the California Highway Patrol's accident report.[3]

Shortly after the accident, Santangelo hired two attorneys to pursue a claim against Santangelo's mother's insurance carrier, Farmers Insurance, *not* against Firestone.[4] In June 1998, Santangelo's attorneys had the Firestone tires removed from the wrecked Ford Explorer and sent the tires to a tire failure analyst. The majority concludes that Santangelo's attorneys first had knowledge of facts giving them reason to suspect the tires might be defective in June 1998, when the attorneys preserved the tires, engaged a tire failure analyst to inspect the tires, and inquired into the California Highway Patrol's accident report that mentioned the tire tread separation. Maj. Op. at 3-4. The majority also concludes that

---

[3] The California Highway Patrol's accident report noted that the left rear tire of the Ford Explorer suffered a tire separation "[d]ue to an unknown reason" and Santangelo's mother "overreacted by turning [the Ford Explorer] hard right where she lost control." The report also stated that three of the four tires on the vehicle showed signs of rubber deterioration and should have been replaced. In the section designated "Cause," the report noted that Santangelo's mother "caused this collision by being in violation of [California Vehicle Code § 22107] – Unsafe turning movement."

[4] The majority states that Santangelo hired her attorneys to look into possible tire defects. Maj. Op. at 6 n.4. Santangelo has consistently stated that she hired the attorneys to pursue a claim only against her mother's insurance carrier, Farmers Insurance.

2

Santangelo's attorneys' knowledge of these facts are imputed to Santangelo.[5] Maj. Op. at 4.

Knowledge that the left rear tire tread separated and that her attorneys sent the Ford Explorer's tires to a tire failure analyst does not demonstrate that Santangelo suspected or should have suspected that her injuries were caused by wrongdoing – here, a *defect* in the Firestone tires – rather than by her mother's negligent driving or another cause, such as a failure to properly maintain the tires. *See Ward v. Westinghouse Canada, Inc.*, 32 F.3d 1405, 1407 (1994) ("[K]nowledge of an injury and its cause does not necessarily imply that any wrongdoing has occurred or that anyone is to blame."). This should be particularly true here because Firestone consistently stated that "there was no evidence of a defect" in the Radial ATX tires. *Bridgestone/Firestone Tire Recall: Panel III of a Hearing Before Subcomms. on Telecomms, Trade & Consumer Protection and Oversight & Investigations of the H. Comm. on Commerce*, 106th Cong. (2000) (statement of Jacques Nasser, President and CEO, Ford Motor Company). Even the Ford Motor Company, which equipped its Ford Explorer with Firestone Radial

---

[5] Even if Santangelo's attorneys suspected that the tire was possibly defective, her attorneys' *suspicion* is not imputed to Santangelo. *See* Restatement (Third) Of Agency § 5.03 (2006) (stating that an agent's *knowledge* of a fact, not mere suspicion, is imputed to the principal).

ATX tires, did not discover conclusive evidence that the tires were defective until Ford "literally pried the data from Firestone's hands" and Ford's engineers analyzed the data themselves. *Id.* This was just days before the Firestone Radial ATX tire recall in August 2000. *Id.*

Moreover, "[i]t would be contrary to public policy to require" Santangelo "to file a lawsuit at a time when the evidence available to [her] failed to indicate a cause of action." *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 815 (2005) (citation and internal quotation marks omitted). One of Santangelo's attorneys testified in a deposition that the tire failure analyst told him that there were no "defects in the tire that would have caused the tread separation, nothing in the design, manufacture, components . . . ." Therefore, after the tire failure analyst presented his conclusions to Santangelo's attorneys, the attorneys *knew* that there were no manufacturing or design defects in the Firestone tires that would have caused the tread separation.[6]

The attorney's subsequent actions reinforce his testimony that the tire failure analyst told him that the was no defect in the tire. About a year after the accident,

___

[6] There is a genuine issue of material fact here. The tire failure analyst denied telling Santangelo's attorney that the tire was not defective. Because we draw all factual inferences in favor of the non-moving party, we only should consider Santangelo's attorney's statement that the tire failure analyst told him that the tire was not defective.

Santangelo's attorney informed Farmers Insurance that the tire investigation did not "pan out," and the attorney pursued a claim against Farmers Insurance, recovering the maximum policy limit of $100,000. The attorney also advised the tire failure analyst that the case was closed, and the tire failure analyst disposed of the tire. Thus, it would have been a frivolous lawsuit had Santangelo filed a complaint against Firestone after the tire failure analyst reported that there was no manufacturing or design defect in the tire. *Id.*

The statute of limitations was not triggered in June 1998. Because there was an investigation which disclosed only that Santangelo's mother's overcorrection caused the accident, and not that there was a tire defect, the discovery rule postpones the statute of limitations on the newly discovered manufacturing defect claim against Firestone. *Id.* at 813 ("[I]f a plaintiff's reasonable and diligent investigation discloses only one kind of wrongdoing when the injury was actually caused by tortious conduct of a wholly different sort, the discovery rule postpones accrual of the statute of limitations on the newly discovered claim.").

When the evidence is viewed in the light most favorable to Santangelo, it is clear that the statute of limitations did not begin to run until Santangelo learned of the nationwide recall of Firestone Radial ATX tires in August 2000. Because Santangelo filed the present complaint against Firestone in April 2001, within one

5

year of the August 2000 Firestone tire recall, she filed within the one-year statute of limitations period.  Thus, I would reverse the district court's grant of summary judgment in favor of Firestone and remand for further proceedings.