Filed 10/31/13  Hakimjavadi v. Getinge, USA CA1/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| AHMAD HAKIMJAVADI et al.,<br><br>        Plaintiffs and Appellants,<br><br>v.<br><br>GETINGE, USA, INC.,<br><br>        Defendant and Respondent. | A134939<br><br>(San Francisco City & County<br>Super. Ct. No. CGC-10-503562) |

Plaintiffs Ahmad and Behjat Hakimjavadi appeal the judgment entered following the trial court's order granting summary judgment in favor of defendant and respondent Getinge, USA, Inc. (Getinge) on plaintiffs' complaint against Getinge for personal injury, breach of implied warranty and loss of consortium.  The trial court awarded summary judgment in favor of Getinge because plaintiffs filed their complaint after the statute of limitations had expired.  We shall affirm.

**BACKGROUND**

Plaintiffs[1] filed their complaint on September 14, 2010.  According to the allegations of the complaint, Ahmad and Behjat are husband and wife and were married in Iran.  Before plaintiffs moved to the U.S.A., Ahmad was a licensed dentist in Iran from 1995 to 2005.  From 2005–2007, Ahmad worked as a dental assistant in Concord, during which time he passed his national board dental exam and applied to a dentist program at

---

[1] For ease of reference, and meaning no disrespect, in the course of this opinion we shall refer to Ahmad and Behjat Hakimjavadi jointly as "plaintiffs" and refer to each individually by their first name.

1

the University of Pacific (UOP) in order to become a fully licensed dentist. In October 2007, Ahmad was hired by UOP to work at its San Francisco location as a sterilization technician. As such, his main duty was to sort the used dental instruments and load them into auto washers to sterilize the equipment; this process entailed the regular use of three types of detergents, viz., acid detergent, alkaline detergent and Powercon. From time to time, the auto washers leaked detergent-filled water onto the floor and released aerosol fumes during the sterilization process, thereby exposing Ahmad to Powercon and other detergents. Ahmad was unaware of the health effects of inhaling the fumes from these detergents. At some point, Ahmad started developing pain in his wrists and elbows and numbness in his right fingers. Also, an urologist diagnosed him with kidney stones. On September 19, 2008, Dr. Rachel Dotson diagnosed Ahmad with asthma, found his symptoms were aggravated by chemicals and fumes and advised Ahmad that he should be moved to a location where he would not be exposed to chemicals and fumes. In July 2010, Dr. Sue Lessin diagnosed Ahmad with occupational asthma, autoimmune thyroid disease and memory loss.

In the first cause of action for strict liability, the complaint alleged Powercon was manufactured by Getinge, sold to UOP prior to September 18, 2008, defective at the time of its manufacture because the product and accompanying warnings and instructions failed to warn of its dangerous propensities, and that Getinge knew or should have known Powercon posed a medical risk of causing occupationally-induced asthma. The complaint further alleged the auto washers manufactured by Getinge were also defective because they leaked solvents and detergents such as Powercon. In addition, the complaint alleged causes of action for breach of implied warranty and loss of consortium, and prayed for damages and medical expenses according to proof at trial.

In January 2011, Getinge filed an answer to complaint, generally denying plaintiffs' causes of action and asserting multiple affirmative defenses. Getinge's second affirmative defense stated that the complaint was barred by the applicable statutes of limitation. Subsequently, Getinge filed a motion for summary judgment, contending the

2

complaint was barred by the two-year statute of limitations for personal injury actions because the undisputed facts showed Ahmad was aware, or should have been aware upon the exercise of reasonable diligence, of his injury and its cause by mid-2008 at the latest.

Plaintiffs opposed the motion for summary judgment, contending there was a triable issue of fact as to when the two-year statute of limitations began to run and asserting the statute of limitations was triggered on September 17, 2008,[2] when Dr. Dotson first diagnosed Ahmad with occupationally-related asthma.

The trial court held a hearing on the motion for summary judgment on December 12, 2011. On January 18, 2012, the trial court filed an order granting Getinge's motion for summary judgment, stating, "After full consideration of the . . . papers, evidence, and authorities submitted by the parties, as well as the argument at the hearing, the Court finds that the statute of limitations was triggered on [Ahmad's] visit with Dr. Dotson on August 7, 2008." Notice of entry of judgment was filed on February 8, 2012, and plaintiffs filed a timely notice of appeal on March 8, 2012.

## DISCUSSION

The statute of limitations for an action for injury to an individual caused by the wrongful act or neglect of another is two years. (See Code of Civ. Proc., § 335.1.)[3] Furthermore, "[i]n any civil action for injury or illness based upon exposure to a hazardous material or toxic substance, the time for commencement of the action shall be no later than either two years from the date of injury, or two years after the plaintiff becomes aware of, or reasonably should have become aware of, (1) an injury, (2) the physical cause of the injury, and (3) sufficient facts to put a reasonable person on inquiry notice that the injury was caused or contributed to by the wrongful act of another, whichever occurs later." (§ 340.8, subd. (a).)

---

[2] The complaint alleges this diagnosis occurred on September 19, 2008, but the record indicates the correct date is September 17, 2008. Any discrepancy has no bearing on the outcome here.

[3] Further statutory references are to the Code of Civil Procedure unless otherwise noted.

3

Section 340.8 codified California's discovery rule, as the rule is explained in *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103 (*Jolly*) and *Clark v. Baxter Healthcare Corp.* (2000) 83 Cal.App.4th 1048 (*Clark*). (See Historical and Statutory Notes, 13C West's Ann. Code Civ. Proc. (2006 ed.) foll. § 340.8, p. 248.) "Under the discovery rule, the statute of limitations begins to run when the plaintiff suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her. [T]he limitations period begins once the plaintiff has notice or information of circumstances to put a reasonable person *on inquiry*. . . . A plaintiff need not be aware of the specific facts necessary to establish the claim; that is a process contemplated by pretrial discovery. Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her." (*Jolly, supra,* 44 Cal.3d at pp. 1110–1111 [internal citations, footnote and quotation marks omitted, italics in original].)

In reviewing a grant of summary judgment based on the statute of limitations, our task is to identify the issues framed by the pleadings and "determine whether only one legitimate inference may be drawn from [the undisputed facts] regarding the amount of notice or information of circumstances that would put a reasonable layperson on inquiry about potential wrongdoing that harmed her, such as will begin the running of the limitations period. [*Jolly, supra,* 44 Cal.3d at p. 1112.]" (*Clark, supra,* 83 Cal.App.4th at p. 1055.)

In this regard, the key issue framed by the pleadings is whether Ahmad suffered injury as alleged, including "numbness, tingling, blurred vision, headaches, excessive tiredness, asthma," caused by inhaling fumes from chemical detergents released in aerosol form from the auto washers during operation, or released from detergent-filled water that spilled from the auto washers onto the floor of the facility. Pertinent to that issue, the undisputed facts show Ahmad was hired by UOP as a sterilization technician in October 2007. His main duty as a sterilization technician was to sort used dental

4

instruments and load them into the auto washers to sterilize the equipment. The auto washers were supplied to UOP by Getinge. During the course of his duties, Ahmad regularly utilized an acid detergent, an alkaline detergent and Powercon detergent, all supplied by Getinge to UOP. Ahmad complained about water spilling from the auto washers on several occasions and every time a person responded to the problem. Ahmad also noticed a problem with the drain system in the sterilization room; the drain system could not handle discharge from all three auto washers at once, resulting in spillage. Ahmad also complained multiple times about the ventilation system in the sterilization room; the room was always humid and he thought the ventilation system was insufficient to handle three auto washers running all the time in a confined space.

The undisputed facts also show Ahmad began to complain about injuries associated with his work in the sterilization room some time before August 7, 2008. Indeed, according to Behjat's deposition testimony, Ahmad began complaining about the auto washers in late 2007, a few months after he began working at UOP. According to Behjat, Ahmad complained the machines were giving him headaches and said, "the smell [was] bothering him." Also, Behjat said Ahmad complained the machines gave him a burning sensation in his eyes and she noticed "[h]e came home with . . . red eyes."

Ahmad's time frame differed slightly; in his deposition, he stated he began to complain to Behjat about physical ailments resulting from his work at UOP after an incident that occurred on BART on March 6, 2008. A few weeks after the BART incident, he would come home after work and complain to Behjat that the conditions at work made his eyes burn, gave him a cough and made him fatigued.

Ahmad described the BART incident in his declaration opposing summary judgment. He stated, "[o]n March 6, 2008, I had some form of a breathing attack on the BART train to work. I could not [find] breath. This was the first time I had ever had such an incident in my life. I went to the Emergency Room that day . . . ." Ahmad further stated that at the emergency room he was diagnosed with anxiety which he did not attribute to work, but to his son's illness with cancer. However, the discharge

5

instructions Ahmad received from the hospital after treatment at the emergency room stated, "[y]ou have been diagnosed by your caregiver as having chest wall pain." It further stated, "[y]our present problem may be from anxiety and emotional distress."

The record shows Ahmad also suffered ailments not encompassed in this suit. He began to develop pain in his right wrist and arm on June 27, 2008, and was working a light duty schedule until July 21, stopped work on that date due to a kidney stone condition and was off work on disability leave through September 2008. Ahmad was sent to Dr. Rachel Dotson, a pulmonary specialist, for evaluation after a CAT scan in connection with his kidney stone condition revealed nodules at the base of his lungs. In her deposition, Dr. Dotson stated she first saw Ahmad on August 7, 2008. At that time, Ahmad complained he had been suffering shortness of breath over the past six months and had experienced "one or two episodes" due to shortness of breath during that time frame. Ahmad also had hemoptysis (the coughing up of blood or of blood-stained sputum from the bronchi, larynx, trachea, or lungs).[4] Dr. Dotson asked Ahmad if he had any known exposure to chemicals and he replied that he "may be exposed" while working in the sterilization room at UOP. Dr. Dotson thought the shortness of breath and chest tightness experienced by Ahmad might be caused by asthma. Asked whether she discussed that with him, she stated she ordered a pulmonary function test for asthma, and when she orders a test it is her standard practice to tell the patient why she is ordering the test, and she had no reason to believe she strayed from her standard practice in treating Ahmad.

Dr. Dotson saw Ahmad for a followup appointment on September 17, 2008, immediately after Ahmad took a pulmonary function test. In her report of that date to Ahmad's primary physician, Dr. Dotson states, Ahmad "has not had any further episodes of hemoptysis, but continues to have an occasional cough, productive of scant yellow sputum. He has occasional wheezing, but has not had any more attacks of shortness of breath . . . . While he was away from work to study for the board exam, he felt much

---

[4] (See http://en.wikipedia.org/wiki/Hemoptysis.)

6

better from a respiratory standpoint. He is fairly certain that the chemicals and fumes that he has been exposed to at work aggravate his symptoms." Also, Dr. Dotson stated, Ahmad's "pulmonary function tests show a borderline ratio and an elevated residual volume which is consistent with mild obstruction and airtrapping. In addition, he does have expiratory wheezing on exam. This is consistent with a diagnosis of asthma. He may simply have adult-onset asthma or this may be more of a reactive airways disease picture due to fume and chemical exposure at work."

On September 19, 2008, Dr. Dotson wrote a letter on Ahmad's behalf addressed "To Whom It May Concern." The letter stated in pertinent part, "Mr. Hakimjavadi has recently been diagnosed with asthma. His asthma symptoms are aggravated by chemicals and fumes at his current workplace. Please relocate the patient to a position where he is not exposed to these fumes and chemicals."

The foregoing facts are all undisputed. Considered in the context of the key issue framed by the pleadings, the undisputed facts are "susceptible of only one legitimate inference"—by August 7, 2008, at the latest, Ahmad was on inquiry notice that conditions at work might be causing the headaches, burning eyes, fatigue and shortness of breath he had been suffering over the prior six months or so. (*Jolly, supra,* 44 Cal.3d at p. 1112.) Accordingly, under the discovery rule, the two-year statue of limitations was triggered on August 7, 2008, at the latest; therefore, the complaint, filed in September 2010, was time barred and summary judgment was properly granted. (See *id.* at pp. 1110–1111 ["statute of limitations begins to run when the plaintiff *suspects or should suspect* that her injury was caused by wrongdoing [i.e.,] . . . once the plaintiff has notice or information of circumstances to put a reasonable person *on inquiry*."] [Internal citations & quotation marks omitted; first italics added, second in original].)

Plaintiffs, however, assert the undisputed facts show the statute of limitations was triggered on September 17, 2008, when Ahmad was actually diagnosed with asthma by Dr. Dotson. Specifically, plaintiffs submit Ahmad did not sustain "actual and appreciable" damage until his asthma diagnosis because without such diagnosis, "there

7

was no treatment, no meaningful medical bills, no lost days of work—only nominal damages." Here, plaintiffs rely on the rule that the statute of limitations does not begin to run "before plaintiff possesses a true cause of action, by which we mean that events have developed to a point where plaintiff is entitled to a legal remedy, not merely a symbolic judgment such as an award of nominal damages." (See *Davies v. Krasna* (1975) 14 Cal.3d 502, 513 (*Davies*); see also *Budd v. Nixen* (1971) 6 Cal.3d 195, 200, superseded in irrelevant part by § 340.6 [holding that limitations period on plaintiff's legal malpractice action did not begin until plaintiff had suffered "appreciable harm" and "mere breach of . . . duty, causing only nominal damages, speculative harm, or the threat of future harm— not yet realized—does not suffice to create a cause of action for negligence"].)

However, the *Davies* court clarified that "although a right to recover nominal damages will not trigger the running of the period of limitation, *the infliction of appreciable and actual harm, however uncertain in amount*, will commence the statutory period. Under present authority, neither uncertainty as to the amount of damages nor difficulty in proving damages tolls the period of limitations." (*Davies, supra,* 14 Cal.3d at p. 514, italics added.) Here, whereas Ahmad was not diagnosed with asthma until September 17, 2008, there is no question that on or before August 7, 2008, Ahmad suffered appreciable and actual harm induced by conditions at work, including coughing, burning sensations in his eyes, fatigue and shortness of breath, and hemoptysis. Thus, the "nominal damages" rule acknowledged in *Davies* has no application here.

Also, whereas plaintiffs acknowledge Ahmad related his fatigue, cough, and burning eyes to his work conditions, they assert he was unsure whether the injury he suffered in the BART incident was related to the work place. On that basis, plaintiffs contend "there remains a triable issue of fact as to when Ahmad became aware that the entire spectrum of symptoms[] could reasonably be connected to the Getinge products at work." We disagree. Any reasonable person who suffered fatigue, coughing, and burning eyes, and associated those symptoms with work place conditions, would also be suspicious that shortness of breath experienced during the same time frame might also be

associated with the same work place conditions. (See *Jolly, supra,* 44 Cal.3d at p. 1111 "plaintiff need not be aware of the specific 'facts' necessary to establish the claim; that is a process contemplated by pretrial discovery [and] [s]o long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her".)

Finally, relying on cases such as *Clark,* and *Nelson v. Indevus Pharmaceuticals, Inc.* (2006) 142 Cal.App.4th 1202 (*Nelson*), plaintiffs contend that even if Ahmad suspected his injuries were related to the work place, he was not placed on notice of any wrongdoing by Getinge until he was diagnosed with asthma in September 2008. Pertinent here is the rule noted by the *Clark* court that under California law "it is not enough to commence the running of the limitations period when the plaintiff knows of her injury and its factual cause (or physical cause). Rather, the plaintiff must be aware of her injury, its factual cause, *and sufficient facts to put her on inquiry notice of a negligent cause*. [Citation.]" (*Clark, supra,* 83 Cal.App.4th at p. 1057, italics added.) Applying this rule, the *Clark* court reversed summary judgment in favor of manufacturers who produced and supplied latex gloves used by plaintiff nurse in the course of her employment. The court reasoned that although plaintiff knew the fact of her injury (an allergy to natural latex) and its cause (latex gloves), "triable issues of fact have been raised regarding her knowledge or awareness that a defendant's wrongdoing [such as adding toxic chemicals to the latex] may have affected the product, latex gloves, that was giving rise to her allergies." (*Id.* at p. 1059.) Along the same lines, plaintiffs contend they have raised a triable issue of fact that they were unable to link Ahmad's injuries to Getinge's products until Ahmad was actually diagnosed with asthma. The analogy to *Clark* fails, however. Ahmad admitted in his deposition that before Dr. Dotson diagnosed him with asthma he believed the asthma-like symptoms he was suffering were connected to his work. Moreover, both Ahmad and Behjat testified that Ahmad would come home and complain the machines and fumes were giving him headaches and a burning sensation in his eyes. Thus, in contrast to *Clark,* the undisputed facts here

9

demonstrate plaintiffs had sufficient facts to put them "on inquiry notice of a negligent cause" of Ahmad's injuries. (*Id.* at p. 1057.)[5]

## DISPOSITION

The judgment is affirmed. Appellants shall bear costs on appeal.

_____
Sepulveda, J.*

We concur:

_____
Margulies, Acting P.J.

_____
Banke, J.

* Retired Associate Justice of the Court of Appeal, First Appellate District, Division Four, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

---

[5] Nor does *Nelson, supra,* 142 Cal.App.4th 1202 aid plaintiffs. In *Nelson*, where it was undisputed plaintiff did not know about the danger of the Fen-phen prescription diet drug before Spring 2002, the appellate court reversed summary judgment in favor of the manufacturer and rejected the manufacturer's "constructive suspicion" argument that plaintiff was on inquiry notice long before 2002 because of the negative publicity the drug had received in the media. (See *id.* at pp. 1205–1208.) Patently, *Nelson* is factually inapposite to the case at bar.