Filed 5/21/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| ISMAEL ROSAS, | B257127 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC400974) |
| v. | |
| BASF CORPORATION et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Amy D. Hogue, Judge. Reversed and remanded.

Metzger Law Group, Raphael Metzger, Kimberly A. Miller, Kathryn A. Saldana, Kenneth A. Holdren, for Plaintiff and Appellant.

Schiff Hardin, John N. Scholnick, Amy M. Rubenstein, Kathleen A. Stimeling, for Defendant and Respondent BASF Corporation.

Wilson Elser Moskowitz Edelman & Dicker, Thomas C. Corless, Josephine C. Lee-Nozaki; Cray Huber Horstman Heil & Vanausdal, Daniel K. Cray, Scott D. Pfeiffer, for Defendant and Respondent Berje Inc.

Booth, Jason M. Booth, Emily J. Atherton, for Defendant and Respondent Citrus and Allied Essences Ltd.

Horvitz & Levy, David M. Axelrad, Dean M. Bochner; Lewis, Brisbois, Bisgaard & Smith, Peter L. Garchie, Ruben Tarango; Sedgwick, Craig S. Barnes, Robert Kum, for Defendant and Respondent Centrome, Inc.

1

Arnett Law Group, Daniel J. Arnett, Kurt B. Drain; Wood, Smith, Henning & Berman, Tracy M. Lewis, for Defendant and Respondent Elan Chemical Company, Inc.

Gordon & Rees, Miles D. Scully, Jason F. Meyer, J. Todd Konold, Kara Persson, for Defendant and Respondent Emoral, Inc.

WFBM, Karen M. Sullivan, Sadaf A. Nejat, for Defendant and Respondent O'Laughlin Industries, Inc.

Alston & Bird, Peter Masaitis, Jesus J. Torres, for Defendants and Respondents O'Laughlin Industries Co., Ltd. and O'Laughlin Tianjin Industries Co.

_____

Plaintiff and appellant Ismael Rosas appeals from judgments entered after the trial court granted summary judgment in favor of defendants and respondents BASF Corporation; Berje Inc.; Citrus and Allied Essences Ltd.; Centrome, Inc., dba Advanced Biotech; Elan Chemical Company, Inc.; Emoral, Inc.; O'Laughlin Industries, Inc.; O'Laughlin Industries Co., Ltd.; and O'Laughlin Tianjin Industries Co.[1] He also appeals the order denying his postjudgment motion for relief and reconsideration.

The result on appeal turns on whether the evidence[2] is susceptible to only one legitimate inference supporting the conclusion that, as a matter of law, Rosas was aware of his injury and facts that would lead a reasonable person to suspect a wrongful cause for that injury. The trial court concluded that a two-year statute of limitations began to run on Rosas's claims in 2003, because the undisputed evidence demonstrated he was hospitalized with an unknown disease that he suspected was caused by exposure to a particular chemical at his work in a food flavoring plant. We conclude the evidence is susceptible to more than one legitimate inference, and that it is a question of fact for the jury to determine whether the facts known to Rosas before November 2006 were enough to put a reasonable person on inquiry notice that his lung disease was caused by the wrongful act of another. Accordingly, we reverse the trial court's order granting summary judgment and remand for further proceedings.

---

[1] Defendant and respondent BASF Corporation filed a respondent's brief, to which defendants and respondents Berje Inc.; Citrus and Allied Essences Ltd.; Centrome, Inc., dba Advanced Biotech; Elan Chemical Company, Inc.; Emoral, Inc.; O'Laughlin Industries, Inc.; O'Laughlin Industries Co., Ltd.; and O'Laughlin Tianjin Industries Co. joined.

[2] Unless specifically noted, the facts relied upon in this opinion are based solely on the evidence before the court at the time of the April 9, 2014 summary judgment hearing. We need not consider any of the evidence presented by the parties in connection with Rosas's April 18, 2014 motion for reconsideration.

**FACTUAL AND PROCEDURAL BACKGROUND**

Rosas was an employee at Gold Coast Ingredients, Inc. from 1994 or 1995 until April 2007.  The company manufactures and sells food flavoring products.  After he was transferred to the powder production room in 1996, Rosas's responsibilities included mixing various powders and liquids, including liquid chemicals such as diacetyl and benzaldehyde, to make food flavorings.  Rosas testified he used many liquid chemicals, too many to remember all their names.  Between 1996 and 2001, Rosas made flavorings using diacetyl about three times a day, and after 2001, the frequency increased to about six times a day, because the company was making larger amounts of butter flavoring.

Sometime after he began working with the powders and chemicals, he began experiencing pain or irritation in his nose, eyes, throat, and lungs.  He began coughing around 2000 or 2002.  In 2001, he saw a doctor for flu-like symptoms and was given antibiotics.  He was out of work for two or three days due to his illness, and returned with a doctor's note stating he had "chronic acute bronchitis."

In 2003, Rosas spent four days in the hospital for symptoms of pneumonia.  He had a lot of coughing, fever, phlegm, and pain in his nose and lungs.  Rosas shared with his doctors his suspicions that his illness might be related to chemicals at work, but doctors never communicated a diagnosis to him or told him his illness was due to his work.

Rosas continued to experience coughing and flu-like symptoms in 2004, but the appellate record does not contain evidence any doctor diagnosed the problem or its cause.  Sometime in 2005, Rosas asked to be moved from the powder production room to the warehouse, because he felt the powder related to his increasing cough.  According to Rosas's testimony, he brought a note from one of his doctors and Gold Coast transferred him to the warehouse a few days later.  However, Rosas's supervisor testified he did not recall learning of any health issues as a result of Rosas's work at Gold Coast until after Rosas stopped working in 2007.

In May 2005, Rosas was referred to Dr. Korotzer, a pulmonary physician at Kaiser, because his symptoms were no longer "flu-like." Dr. Korotzer examined Rosas and determined that he had severe obstructive lung disease, but that its etiology, or cause, was unclear. Dr. Korotzer's medical report included a medical history that noted Rosas's past diagnoses of chronic bronchitis and his hospitalization in February 2003 for pneumonia. It notes a chronic runny nose and congestion, including postnasal drip, and that a February 2003 sinus x-ray was consistent with chronic sinusitis. Dr. Korotzer also notes that a chest x-ray from February 2005 "is relatively unchanged from x-rays dating back to February 2003, although there may be some slight increase in the prominence of the lung markings over this time period." The "social history" section of the report stated: "The patient works in a boiler room. In the past, he has been exposed to some dust, which is sand-like, and he thinks it is some sort of sugar molecules, although he is not sure of the exact name of it. He wore a mask during this time, and was exposed to this dust for approximately three years. He is no longer working in that department, and is now no longer exposed to any type of dust. He does work with some chemicals at the present time. These do not cause him any kind of irritation." Dr. Korotzer ordered a CAT scan to rule out some possible explanations for Rosas's lung disease.

On April 26, 2006, Rosas saw his primary care physician, Dr. Rodriguez, because his cold was more constant and his nose was very itchy. Dr. Rodriguez told him it was normal for people who worked with powder to have allergic symptoms like a cough and runny nose. The doctor gave him a note stating Rosas "suffers from chronic lung disease. He should not work around chemicals or toxic substances. He also shouldn't do work that requires moderate to heavy exertion."

On July 14, 2006, Rosas returned to the pulmonary physician, Dr. Korotzer, who noted that the likely cause of his disease was an old infection. Dr. Korotzer wrote and gave Rosas the following note: "To Whom It May Concern: [¶] I am a pulmonary physician at Kaiser Permanente Bellflower caring for Ismael Rosas. The patient has a chronic lung condition. Usually with this chronic lung condition exposure to odors from chemicals or fumes from any type causes the patient's respiratory condition and

4

symptoms to worsen.  Therefore, possible in the work environment minimization of any exposure to chemicals, fumes or odors will help the patient in [*sic*] and would be advisable if possible." Although Dr. Korotzer believed that exposure to irritants such as strong odors or chemicals could exacerbate Rosas's underlying chronic lung condition, causing a flare-up or increased symptoms such as severe cough and wheezing, he did not believe Rosas's exposure to chemicals had caused the lung condition.

Rosas saw Dr. Korotzer again in September 2006 about his continuing cough and difficulty breathing.  Rosas told Dr. Korotzer he worked with powder, and Dr. Korotzer responded that some people sometimes respond to that type of powder.  The notes from that visit indicate that the cause of Rosas's illness remained unknown, but the severe lung obstruction had worsened from August 2006.  There is no evidence in the record that Dr. Korotzer asked any follow-up questions about the powders or chemicals Rosas was exposed to at work, and Rosas testified he did not tell the doctor about any suspicions the powders or chemicals might be causing his illness.  Rosas did not list the particular powders or chemicals he was exposed to at work, but there is no evidence a doctor asked him to do so either.  Dr. Korotzer wrote another "To Whom It May Concern" letter advising that Rosas has a chronic lung condition and is limited to carrying no more than 50 pounds for any length of time.  The letter noted that this would greatly aid Rosas in terms of his respiratory function.

In November 2006, doctors from the National Institute for Occupational Safety and Health (NIOSH) met with Gold Coast employees, and a doctor informed Rosas the results from his pulmonary function test were the worst of all the employees, he had bronchiolitis obliterans, and his illness was caused by diacetyl.  In early November, a doctor with the occupational health branch of the California Department of Health Services contacted Dr. Korotzer and informed him of the health risks associated with exposure to flavoring ingredients, including the chemical diacetyl, and its association to the lung disease bronchiolitis obliterans.  Before communicating with the Department of Health Services, Dr. Korotzer had never read anything about any connection between the flavoring industry and lung disease, and had never treated a patient for bronchiolitis

5

obliterans.  After reading some materials, Dr. Korotzer felt confident that chemical exposure had likely caused Rosas's lung disease.  Dr. Korotzer met with Rosas on November 22, 2006, noting that the patient "[f]eels OK" and is able to do his work assembling boxes with little problem.  The doctor's notes also state that he advised Rosas to notify him if he had increased symptoms, and Rosas was no longer exposed to any chemicals at the workplace.

In the context of a workers' compensation proceeding, a qualified medical examiner opined that Rosas's injury "became permanent and stationary on March 21, 2007."  Rosas continued working at Gold Coast until April 2007, and in February 2008, Dr. Korotzer wrote a letter stating Rosas was "completely and totally permanently disabled, due to a severe, chronic lung infection."

## A. Complaint

Rosas filed an initial complaint on October 30, 2008.[3]  In January 2012, he filed a Second Amended Complaint, which contained more detailed allegations and named many more defendants.  The gravamen of Rosas's complaint is respondents are liable for the lung injuries he suffered as a result of his workplace exposure to diacetyl, a chemical manufactured or sold by respondents for use in food manufacturing.[4]  The complaint alleges that Rosas did not learn of his injuries or their cause until he was diagnosed with bronchiolitis obliterans.

---

[3] Two other individuals are named plaintiffs in the complaint, but their claims were not the subject of the motion for summary judgment, nor are they parties to this appeal.

[4] The Second Amended Complaint alleges four causes of action:  (1) strict liability, design defect; (2) strict liability, failure to warn; (3) negligence; and (4) fraudulent concealment.

## B. Motion for Summary Judgment

In an amended motion for summary judgment, BASF argued that Rosas's claims were barred by the statute of limitations because he was on inquiry notice more than two years before filing his original complaint on October 30, 2008.[5]  BASF offered evidence demonstrating that Rosas had been healthy before starting work at Gold Coast, began experiencing adverse health effects soon after he started working in the powder production room, and that by 2003, his exposure to diacetyl was making him sick.  BASF argued that the statute of limitations started to run by mid-2005 at the latest, because by then, doctors had told Rosas he had severe obstructive lung disease, and he had asked to be moved from the powder production room to the warehouse because he suspected the chemicals were making him sick.

## C. Opposition to Motion for Summary Judgment

In his opposition, Rosas argued that in order to prevail on summary judgment, BASF bore the burden of proving that he was, or should have been aware of (1) his *injury*, (2) its physical *cause*, and (3) sufficient facts that would lead a reasonable person to suspect his injury was caused by the *wrongful act* of another.  He argued that the evidence in support of BASF's motion did not establish that Rosas was aware of the three distinct elements required to trigger the statute of limitations before October 30, 2006.  Instead, the statute did not begin to run until November 2006, when NIOSH diagnosed Rosas with bronchiolitis obliterans, caused by diacetyl exposure.  First, until receiving a diagnosis from NIOSH in November 2006, he was unaware of an *injury* significant

---

[5] BASF initially filed a motion for summary judgment on October 28, 2013.  Its January 14, 2014 amended motion made the same legal arguments, but included Rosas's testimony at a workers' compensation hearing.
  Berje Inc.; Citrus and Allied Essences Ltd.; Centrome, Inc., dba Advanced Biotech; O'Laughlin Industries, Inc.; O'Laughlin Industries Co., Ltd.; and O'Laughlin Tianjin Industries Co. each joined in BASF's motion for summary judgment.  Elan Chemical Company, Inc. filed a separate motion for summary judgment.

enough to trigger the statute of limitations. Second, because his doctors did not believe or advise him that the chemicals in his workplace were causing his lung disease, and instead only told him the chemicals were only aggravating his symptoms, he was unaware of the *cause* of his lung disease until November 2006. The opposition brief pointed to deposition testimony by Dr. Korotzer, a pulmonary physician who treated Rosas beginning in May 2005, admitting that at the time he did not believe exposure to chemicals was causing Rosas's lung condition, and instead only thought the cause of the lung disease was unknown, and that the chemicals may have been causing his symptoms to be worse. According to Rosas's deposition testimony, the first time a doctor told him chemicals caused his lung disease was when the NIOSH doctor told him in November of 2006. Third, the statute of limitations was not triggered until he suspected or should have suspected a *wrongful cause* of his injury, and there is a triable issue of fact about whether the facts were sufficient to trigger a duty to inquire as to a wrongful cause before November 2006. In support of his last argument, Rosas pointed to deposition testimony where he was asked, "At some time did you start to think in your own mind that somebody had done something wrong to cause your lung disease?" and he answered "No."

## D. Court's Tentative Ruling and Hearing

The trial court issued a tentative ruling indicating it would grant summary judgment on the statute of limitations, noting that under *Grisham v. Philip Morris U.S.A., Inc.* (2007) 40 Cal.4th 623 (*Grisham*), once a plaintiff is aware of an injury and its cause, there is a rebuttable presumption plaintiff is aware of wrongdoing as well. At the hearing on April 9, 2014, Rosas argued defendants had failed to satisfy their burden as to each element necessary to establish a statute of limitations bar, particularly that they offered no evidence that Rosas had reason to suspect wrongdoing. Counsel also argued the *Grisham* presumption raised by the court did not apply. The trial court entered its orders granting summary judgment in favor of BASF and the joining defendants.

8

## E. Post-Summary Judgment Proceedings

On April 18, 2014, Rosas filed a motion for reconsideration and relief under Code of Civil Procedure sections 473 and 1008,[6] presenting additional evidence that Rosas was unaware of a wrongful cause for his injury. While Rosas's motion remained pending, the trial court entered judgment in favor of respondents on May 5, 2014, and June 6, 2014. On June 10, 2014, the trial court denied Rosas's motion. Rosas filed his notice of appeal from the judgments and postjudgment order on June 12, 2014.

## DISCUSSION

Rosas contends the trial court erred in granting summary judgment because triable issues of fact remain as to when he should have known of his injury and its wrongful cause. Rosas argues his complaint was filed within the two-year limitations period under section 340.8, because his cause of action did not accrue until NIOSH advised him that he had bronchiolitis obliterans, caused by his exposure to diacetyl. Until that time, he was unaware of an actionable injury, its cause, or any wrongdoing. Because reasonable minds can differ on whether the facts known by Rosas before October 30, 2006 were such that he should have suspected his lung injuries had a wrongful cause, the lower court erred in granting summary judgment.

## A. Standard of Review

"We review the trial court's ruling on a summary judgment motion de novo, liberally construe the evidence in favor of the party opposing the motion, and resolve all doubts concerning the evidence in favor of the opponent. [Citation.]" (*Garrett v.*

---

[6] All statutory references are to the Code of Civil Procedure, unless otherwise indicated.

*Howmedica Osteonics Corporation* (2013) 214 Cal.App.4th 173, 181.)  "To determine whether triable issues of fact do exist, we independently review the record that was before the trial court when it ruled on defendants' motion." (*Martinez v. Combs* (2010) 49 Cal.4th 35, 68.)  "The rules governing a motion for summary judgment are well known and we need not set them out in detail.  A defendant seeking summary judgment must either prove an affirmative defense, disprove at least one element of the plaintiff's cause of action, or show that some such element cannot be established.  [Citation.]" (*Government Employees Ins. Co. v. Superior Court* (2000) 79 Cal.App.4th 95, 100.)  "A court identifies the issues framed by the pleadings, determines whether the moving party's showing has established facts which negate the opponent's claim and justify a judgment in the moving party's favor, and if the summary judgment motion is meritorious on its face, the court will look to whether the opposition demonstrates there are triable, material factual issues.  [Citation.]  Section 437c, subdivision (c) allows the trial court ruling on the motion to consider all evidence and all the inferences reasonably deducible from the evidence set forth in the papers, 'except summary judgment shall not be granted by the court based on inferences reasonably deducible from the evidence, if contradicted by other inferences or evidence, which raise a triable issue as to any material fact.'  (§ 437c, subd. (c).)" (*Clark v. Baxter Healthcare Corp.* (2000) 83 Cal.App.4th 1048, 1054 (*Clark*).)

### B.  Statute of Limitations and the Discovery Rule

"While resolution of the statute of limitations issue is normally a question of fact, where the uncontradicted facts established through discovery are susceptible of only one legitimate inference, summary judgment is proper.  [Citation.]" (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1112 (*Jolly*); see also *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*) [a triable issue of material fact exists only if the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof].)

10

"[S]tatutes of limitation do not begin to run until a cause of action accrues." (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 806 (*Fox*).) "[A] cause of action accrues at 'the time when the cause of action is complete with all of its elements.'" (*Ibid.*) "An important exception to the general rule of accrual is the 'discovery rule,' which postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action. [Citations.] [¶] A plaintiff has reason to discover a cause of action when he or she 'has reason at least to suspect a factual basis for its elements.' [Citations.]" (*Id*. at p. 807.) A potential plaintiff "discovers the cause of action when he at least suspects a factual basis, as opposed to a legal theory, for its elements, even if he lacks knowledge thereof—when, simply put, he at least 'suspects . . . that someone has done something wrong' to him [citation], 'wrong' being used, not in any technical sense, but rather in accordance with its 'lay understanding' [citation]." (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 397-398 (*Norgart*), fn. omitted.)

"The discovery rule only delays accrual until the plaintiff has, or should have, inquiry notice of the cause of action. The discovery rule does not encourage dilatory tactics because plaintiffs are charged with presumptive knowledge of an injury if they have ""'information of circumstances to put [them] *on inquiry*'"" or if they have ""'*the opportunity to obtain knowledge* from sources open to [their] investigation.'"" [Citations.]" (*Fox, supra*, 35 Cal.4th at pp. 807-808, fn. omitted.) "A plaintiff need not be aware of the specific 'facts' necessary to establish the claim; that is a process contemplated by pretrial discovery. Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her." (*Jolly, supra*, 44 Cal.3d at p. 1111.) Statutes of limitation serve two potentially competing purposes. First, they "give defendants reasonable repose, that is, to protect parties from defending stale claims." (*Id*. at p. 1112.) Second, they "require plaintiffs to diligently pursue their claims." (*Ibid*.) The discovery rule strikes a balance between the two purposes. "Because a plaintiff is under a duty to reasonably investigate and because a *suspicion* of wrongdoing, coupled with a knowledge

11

of the harm and its cause, will commence the limitations period, suits are not likely to be unreasonably delayed, and those failing to act with reasonable dispatch will be barred.  At the same time, plaintiffs who file suit as soon as they have reason to believe that they are entitled to recourse will not be precluded."  (*Ibid*., fn. omitted.)

Section 340.8 incorporates the discovery rule into the statute of limitations for toxic torts, requiring a plaintiff to file a complaint within "two years after the plaintiff becomes aware of, or reasonably should have become aware of, (1) an injury, (2) the physical cause of the injury, and (3) sufficient facts to put a reasonable person on inquiry notice that the injury was caused or contributed to by the wrongful act of another . . . ."  (§ 340.8, subd. (a).)  This two-year limitations period applies in cases alleging personal injury caused by harmful chemicals.  (*Nelson v. Invedus Pharmaceuticals, Inc.* (2006) 142 Cal.App.4th 1202, 1209 (*Nelson*).)  The Legislature passed section 340.8 to codify for toxic torts the delayed discovery rule as described in *Jolly*, *supra*, 44 Cal.3d 1103, *Norgart, supra*, 21 Cal.4th 383, and *Clark, supra,* 83 Cal.App.4th 1048, and to repudiate the holding in *McKelvey v. Boeing North American, Inc.* (1999) 74 Cal.App.4th 151, that media reports regarding a toxic substance could be sufficient to trigger inquiry notice.  (*Alexander v. Exxon Mobil* (2013) 219 Cal.App.4th 1236, 1252 (*Alexander*); *Nelson, supra*, 142 Cal.App.4th at p. 1209.)

### C.  Summary Judgment is Not Warranted When There is a Triable Issue About Whether a Reasonable Person Would Suspect Wrongdoing

Rosas contends the court erred in granting summary judgment because the uncontradicted evidence does not establish that Rosas either was or should have been aware of all three elements required to trigger the statute of limitations under section 340.8:  injury, cause, and wrongfulness.  We need not decide whether the evidence satisfies the injury element, because BASF fails to establish that a reasonable person would suspect a wrongful cause leading to Rosas's chronic lung condition.  "Under the discovery rule, the statute of limitations begins to run when the plaintiff suspects or

12

should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her." (*Jolly, supra*, 44 Cal.3d at p. 1110.) We conclude BASF's evidence is inadequate to establish as a matter of law that Rosas was aware of "sufficient facts to put a reasonable person on inquiry notice that the injury was caused or contributed to by the wrongful act of another . . . ." (§ 340.8, subd. (a)(3).)

*Reason to suspect wrongful cause found as a matter of law*

Cases in which courts have upheld a grant of summary judgment on statute of limitations grounds have involved facts supporting only one legitimate inference. In each case, the court determined that, as a matter of law, the facts supported the legal conclusion that a reasonable person would have suspected their injury had a wrongful cause. In *Rivas v. Safety Kleen Corp.* (2002) 98 Cal.App.4th 218 (*Rivas*), the court upheld a grant of summary judgment based on a one-year statute of limitations where the plaintiff suffered kidney injuries because he used a particular solvent at work. The plaintiff had worked with the solvent daily for almost 18 years, and a number of events took place more than one year before the plaintiff filed a complaint against the solvent manufacturer. First, almost seven years before filing suit, the plaintiff saw a doctor who diagnosed his kidney disease and asked him about the chemicals he used at work. The plaintiff provided the doctor with a list of chemicals, the doctor told him to stay away from the solvent, and plaintiff complied. After receiving a kidney transplant several years later, the plaintiff consulted a workers' compensation attorney to investigate the possibility that the solvent he used at work caused his kidney damage. More than a year before filing his civil lawsuit, the plaintiff filed a workers' compensation action seeking relief based on kidney injuries suffered as a result of exposure to toxic fumes, gases, and liquids. (*Id*. at pp. 223-224.) The appellate court concluded that even if the doctor's advice to keep away from the solvent could be seen as ambiguous and insufficient to arouse a reasonable person's suspicion, the plaintiff's workers' compensation claim "is

definitive proof that he had a suspicion that 'someone ha[d] done something wrong to [him]' long before his civil complaint was filed . . . ." (*Id*. at p. 229.)

In *Norgart, supra,* 21 Cal.4th at pages 405-406, the California Supreme Court held that there was no triable issue of material fact and the defendant pharmaceutical company was entitled to judgment as a matter of law based upon the statute of limitations where a plaintiff admitted, on more than one occasion, suspecting that someone had done something wrong to cause his daughter's death by suicide. The court pointed out that the cause of action accrued when the plaintiffs suspected or had reason to suspect a wrongful cause for their daughter's death, and their failure to file a complaint within one year resulted in their claims being barred. (*Ibid*.)

In *Miller v. Lakeside Village Condominium Assn.* (1991) 1 Cal.App.4th 1611, at pages 1622-1624 (*Miller*), the appellate court rejected the plaintiff's argument that there were triable issues of fact on the question of when she suffered injuries caused by mold exposure such that the statute of limitations on her claims would be triggered. There was undisputed evidence that the plaintiff experienced severe bouts of asthma and was hospitalized in the summer of 1984, and on or before October 1984, plaintiff had her condominium unit tested for mold contamination, retained a microbiologist to pinpoint the source of the mold, and her husband sent a letter to the defendant stating that the flooding caused mold which caused the plaintiff to suffer extreme allergic reactions a year earlier. Based on this evidence, the court concluded that "reasonable minds can draw only one conclusion—that [the plaintiff] suffered appreciable and actual harm . . . and was also aware of its negligent cause by October 1984." (*Id*. at pp. 1623-1624.)

In *Rose v. Fife* (1989) 207 Cal.App.3d 760, the plaintiff suffered an infection and complications from an intrauterine device (IUD), but did not file a complaint against her doctor and the IUD manufacturer until almost three years later. The appellate court rejected her argument that she did not learn of wrongdoing until reading a newspaper article linking her particular IUD type to injuries similar to her own. Instead, a reasonable person would have suspected wrongdoing when the doctors who treated her during her hospitalization told her they felt the IUD was the cause of her infection and it

14

had to be removed.  (*Id*. at 766-767.)  Citing to *Jolly*, the court concluded that even if the plaintiff did not suspect wrongdoing when she was hospitalized, she reasonably should have suspected wrongdoing.  "We hold as a matter of law that a reasonable person would have suspected wrongdoing by [the doctor] and would have inquired; she would have gone to find the facts rather than waiting until October 1985 for the facts to come to her."  (*Id*. at p. 770.)

*Reason to suspect wrongful cause a question of fact left for the jury to decide*

In contrast to the cases discussed above, summary judgment cannot be granted when the facts are susceptible to more than one reasonable inference, or the undisputed facts do not support a finding, as a matter of law, that a reasonable person would suspect that an injury was wrongfully caused.  For example, in *Nelson, supra,* 142 Cal.App.4th 1202, a case decided by this division, the plaintiff suffered from a heart valve disease after taking a diet drug manufactured by the defendant.  The defendant moved for summary judgment, arguing that that the plaintiff should have suspected wrongdoing more than a year before she filed suit, citing to evidence of news reports outlining the risks associated with the drug.  In our published opinion, we reviewed the plaintiff's physical symptoms, which were not directly associated with the one-month time frame during which the plaintiff was taking the drug.  She experienced intermittent heart palpitations, fatigue, and dizziness, and while she did not specifically ask whether her symptoms could be caused by the diet drug, she did ask her doctors about those symptoms, and no doctor ever told her that they were symptoms of heart valve disease or connected to diet drugs.  We concluded that the plaintiff's common and non-specific symptoms did not establish, as a matter of law, that she should have investigated the possibility that she had been harmed by the diet drug.  We therefore reversed the trial court's decision granting summary judgment.  (*Id*. at pp. 1210-1211.)

*Clark, supra,* 83 Cal.App.4th 1048 also reversed an order granting summary judgment, concluding that triable material issues existed about the timeliness of the

15

plaintiff's complaint. *Clark* involved a plaintiff who wore latex gloves while working at a hospital and began suffering from intermittent rashes on her hands and had difficulty breathing. In the spring of 1992, she informed two doctors about an itchy rash on her hands and legs, and thought the problem might have been caused by the gloves she used at work. By the fall of 1993, the plaintiff's hands were cracked and bleeding at work, and she would itch and sneeze when she wore latex gloves. After switching to non-latex gloves, her symptoms subsided. In May 1995, she had an anaphylactic attack (acute allergic reaction) when her gynecologist touched her while wearing latex gloves. However, the plaintiff claimed she did not suspect any of her problems were caused by any wrongdoing until receiving an article in late 1995 about latex allergies litigation. She filed her complaint in January 1996. The court reviewed the facts and holdings from *Jolly*, *supra*, 44 Cal.3d 1103, *Norgart, supra*, 21 Cal.4th 383, and *Miller*, *supra*, 1 Cal.App.4th 1611, and concluded that the plaintiff had raised a triable issue of fact regarding her knowledge or awareness of wrongdoing, because "there is evidence in the record to support a reasonable inference that [plaintiff's] latex allergies did not perforce lead her to suspect that the latex gloves might have been defectively manufactured in some respect." (*Clark*, *supra*, pp. 1059-1060.) Because the record could support an inference that the plaintiff "did not become aware of a potential wrongfulness component of her cause of action until more information than the existence of her allergies placed her on inquiry notice and then was actually gained . . . . triable material issues of fact remain as to the limitations issue." (*Id*. at p. 1060.)

*Demurrer cases where court declines to find statute triggered as a matter of law*

Two other cases were decided at the demurrer stage, but further illustrate that even undisputed facts can sometimes be insufficient to support the conclusion that the statute of limitations was triggered. Instead, the question of when the limitations period commences is a factual issue that cannot be decided as a matter of law. In *Fox*, *supra*, 35 Cal.4th at pages 803-804, the plaintiff suffered complications after gastric bypass

16

surgery, and filed a medical malpractice action against the doctor, treating hospital, and doe defendants in a timely manner. Later, the doctor's deposition testimony revealed problems with the stapler used during the surgery, and the plaintiff filed an amended complaint asserting a products liability claim against the stapler manufacturer, Ethicon. Ethicon demurred, asserting the plaintiff's claims were barred by a one-year statute of limitations, and the plaintiff offered to file an amended complaint clarifying that she had no reason to suspect the stapler until after the doctor's deposition, and that no reasonable person would have suspected a defective stapler. On appeal to the California Supreme Court, Ethicon argued that a Court of Appeal holding in *Bristol-Myers Squibb Co. v. Superior Court* (1995) 32 Cal.App.4th 959, 965-966, established that once a plaintiff has knowledge or suspicion of negligence, the statute of limitations starts to run as to all defendants, regardless of the nature of the wrongdoing or cause of action. (*Fox, supra,* 35 Cal.4th at pp. 811-812.) The Supreme Court rejected that argument, concluding instead that when a plaintiff may only reasonably suspect one type of wrongdoing, the statute of limitations does not begin to run on a wholly different cause of action based on a different type of wrongdoing, the facts as to which the plaintiff may not yet be aware. (*Id.* at pp. 814-815.) In *Alexander, supra,* 219 Cal.App.4th at page 1260, Division Seven of this court refused to uphold a decision sustaining a demurrer where the plaintiffs alleged they did not discover the facts upon which their claims were based until less than two years before filing suit. The defendants argued that the plaintiff's factual allegations, together with additional judicially-noticed facts, established that a reasonable person would have suspected causation and wrongdoing much earlier. (*Id.* at p. 1250.) In rejecting the defendant's argument, the court declined to make that determination as a matter of law, pointing out, "'[w]hen a plaintiff reasonably should have discovered facts for purposes of the accrual of a cause of action or application of the delayed discovery rule is generally a question of fact, properly decided as a matter of law only if the evidence (or, in this case, the allegations in the complaint and facts properly subject to judicial notice) can support only one reasonable conclusion.' [Citations.]" (*Id.* at p. 1252.)

17

**D. A Triable Issue Exists as to Whether Before November 2006, Rosas was Aware of the Cause of his Lung Disease and was on Inquiry Notice as to Possible Wrongdoing**

The trial court erroneously granted summary judgment when the evidence before it was susceptible to more than one legitimate inference. It also erroneously construed BASF's evidence broadly and Rosas's evidence narrowly and drew inferences in favor of BASF, rather than Rosas. (*Aguilar, supra,* 25 Cal.4th at p. 856 [court must view evidence in light most favorable to the party opposing motion for summary judgment].) Because the evidence can support a legitimate inference that a reasonable person in Rosas's situation, knowing the facts known to Rosas, would not have suspected a wrongful cause for his lung disease, respondents are not entitled to summary judgment.

*Triable issue whether facts would lead a reasonable person to suspect a wrongful cause*

Rosas started working with flavoring chemicals in 1996, but testified in deposition that he did not begin experiencing a cough until at least four years later in 2000 or 2002. Although he did experience some illness in 2001 and 2003, his doctors did not express undue concern, viewing his illnesses as perhaps slightly serious versions of maladies such as pneumonia, bronchitis, and sinusitis. Even after he was referred to a specialist because his symptoms were no longer "flu-like," the pulmonary physician did not express concern about anything in his medical history that would lead a person to believe that his illness (by that time diagnosed as "[s]evere obstructive lung disease") was caused by a wrongful act of another.

Neither Rosas's primary care physician, Dr. Rodriguez, nor his pulmonary physician, Dr. Korotzer, ever suggested to Rosas that his lung disease was being caused by his exposure to chemicals at work. Rather, Dr. Rodriguez assured him in April 2006 "[t]hat it was normal for people who worked with powder to have that cough, the runny nose, type of allergy." Dr. Korotzer also testified he did not suspect the chemical

18

exposure to be the *cause* of Rosas's underlying lung disease, only a factor in aggravating his *symptoms*.

Rather than suspecting he or she had been wronged in some way, a reasonable person would do what Rosas did, which is to visit a doctor when a cold and cough continues and seems to be getting worse. But when a doctor tells a patient his symptoms are normal, and a lung specialist is unable to determine the cause of the patient's lung disease, we cannot conclude as a matter of law that a reasonable person would suspect their disease has a wrongful cause. In many ways, the facts of this case are similar to those at issue in *Clark*, where the plaintiff suffered from a debilitating allergy to latex gloves, but did not have any reason to suspect wrongdoing until after joining a support group and receiving an article about possible defective manufacturing. (*Clark, supra,* 83 Cal.App.4th at p. 1053.) Without additional facts, we cannot determine as a matter of law that the facts available to Rosas before November 2006 would put a reasonable person on inquiry notice that his disease was caused by wrongdoing. (*Id.* at p. 1060 ["[i]n this case, under these peculiar circumstances, it cannot yet be determined as a matter of law when the limitations period began to run"].)

The trial court's decision rejected Rosas's argument that he could reasonably rely on the doctors' inability to determine the cause of his lung disease, as well as assurances from two doctors that while chemical exposure might aggravate the symptoms of his lung disease, they were not the cause of his illness. Based on the case law discussed earlier in this opinion, we conclude instead that it is reasonable to expect that a patient with no information about potential wrongdoing would rely on the assurance of a pulmonary physician that chemical exposure is only aggravating the person's symptoms, not causing his underlying disease. (See, e.g., *Fox, supra*, 35 Cal.4th at p. 813 ["a plaintiff's ignorance of wrongdoing involving a product's defect will usually delay accrual because such wrongdoing is essential to that cause of action"]; *Kitzig v. Nordquist* (2000) 81 Cal.App.4th 1384, 1395 [examining the nature of the subjective suspicion necessary to trigger the limitations period during the continued existence of a doctor-patient relationship]; *Nelson*, *supra*, 142 Cal.App.4th 1202, 1208 ["the law only requires an

19

investigation when a plaintiff has a reason to investigate"]; compare *Goldrich v. Natural Y Surgical Specialties, Inc.* (1994) 25 Cal.App.4th 772, 776 [finding untimely the plaintiff's claim against breast implant manufacturers when the plaintiff suffered pain, scarring and disfigurement, and three physicians advised her to have the implants removed more than two years before she filed a complaint].)

Finally, the context of Rosas's workplace also factors into our evaluation of whether a reasonable person would suspect wrongdoing. This is not a scenario where the employee is working with chemicals that are recognized as being hazardous. (See, e.g., *Nguyen v. Western Digital Corporation* (2014) 229 Cal.App.4th 1522 [analyzing when cause of action accrued where plaintiff's mother exposed to hazardous and toxic chemicals in semiconductor industry, leading to plaintiff's birth defects]; *Rivas*, *supra*, 98 Cal.App.4th 218, 223 [plaintiff's daily work tasks included using chemical solvent to degrease automobile parts].) To the contrary, it would be reasonable to assume that chemicals used to make food flavorings intended for human consumption would be relatively safe.

*Inferences drawn in favor of BASF Corporation*

Our independent review of the evidence also highlights the trial court's error in drawing inferences and construing ambiguities in favor of BASF instead of Rosas. For example, the trial court's opinion states that in 2005, "Rosas believed that his cough was worsening because of the chemicals and asked Dr. Korotzer for a letter ordering Rosas moved to warehouse duty, although Rosas still did not tell Dr. Korotzer about his belief that the chemicals were causing his cough." However, a close analysis of the evidence reveals that at the time of the transfer, Rosas was concerned about how powders might be aggravating his cough. The court cites to two pages of Rosas's testimony, during which Rosas consistently refers to powders, not chemicals. Responding to a question about why he asked Dr. Korotzer for a note, Rosas testified, "Because I was coughing a lot. And since we were working with powder, I thought that it was the powder." This testimony

20

would still be important if the chemical in question, diacetyl, was a powder, but it is a liquid chemical, and so the testimony cannot be construed to establish that Rosas was aware of facts that amounted to a cause of action against the manufacturers of diacetyl.

Other evidence supports a more ambiguous and possibly neutral explanation for Rosas's transfer to the warehouse. Rosas testified he provided the doctor's note to his supervisor, and the trial court inferred that Rosas had brought his suspicions about the adverse health effects of continued chemical exposure to his employer's attention, leading Gold Coast to relocate him to the warehouse. Rosas testified that he discussed the matter with his supervisor, Ted Rodriguez, but Rodriguez testified he was unaware of Rosas's health complaints until after Rosas stopped working in April 2007. And according to the medical notes, Rosas had already moved out of the powder production room *before* his first visit with Dr. Korotzer: "In the past, he has been exposed to some dust . . . and was exposed to this dust for approximately three years. He is no longer working in that department, and is now no longer exposed to any type of dust. He does work with some chemicals at the present time. These do not cause him any kind of irritation." It cannot be considered outside the realm of legitimate inferences that at some point before visiting Dr. Korotzer, Rosas asked to be transferred because he wanted to work in a less dusty environment, particularly when it is common knowledge that things like dust and powder can aggravate a cough.

The trial court's conclusion that Rosas suspected diacetyl as the cause of his disease as early as 2003 is also based on testimony from which a different legitimate inference can easily be drawn. Rosas was asked in a workers' compensation hearing whether he suspected his 2003 hospitalization was work-related, and he answered, "Yes." The testimony continued:

"Q: Was there any specific exposure that you had that you suspected was the culprit?

"A: Yes, the chemicals.

"Q: Do you know the names of those chemicals?

"A: Starting with diacetyl. Benzaldehyde."

21

Respondents point to this exchange as establishing unequivocally that in 2003 Rosas suspected his exposure to diacetyl at work was the culprit of his lung disease, and further argue that Rosas cannot create a factual dispute by contradicting his earlier sworn testimony. (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 21 (*D'Amico*) [court need not liberally construe a counteraffidavit presented by party opposing summary judgment to contradict a clear and unequivocal admission of a fact in deposition]; *Scalf v. D.B. Log Homes, Inc.* (2005) 128 Cal.App.4th 1510, 1522 [declining to find *D'Amico* applicable where initial testimony is merely a tacit admission or equivocal concession].) Rosas's testimony regarding the extent and timing of his subjective suspicions is not susceptible to only one legitimate inference. Nothing in the testimony establishes that Rosas suspected in 2003 that a particular chemical was causing his illness, especially because the question asking him to name the chemicals is phrased in the present tense: "Do you know the names of those chemicals?" In the same hearing, when he was asked for the basis for his belief that the chemicals were the culprits, Rosas responded by referencing future events. "Because since they hospitalized me for the first time in 2003, my health kept getting worse." Later in the same hearing, Rosas equivocated on the question of whether the chemicals caused his illness "because the problems that I had was like similar to the flu." In addition, Rosas testified he had shared with his doctor his suspicion that his illness "could be because of the chemicals" but the doctors never told him whether or not his illness was work related. In other testimony, Rosas says he suspected the powders were causing him to cough, and his doctors agreed that some people respond to powders that way. Again, Dr. Korotzer's May 2005 notes corroborate the inference that in 2003 and 2005, Rosas was not contemporaneously aware of facts that would lead him to suspect that a liquid chemical such as diacetyl was causing his lung disease. Instead, the notes report Rosas had "been exposed to some dust, which is sand-like, and he thinks is some sort of sugar molecules, although he is not sure of the exact name of it." Such evidence is insufficient to establish that Rosas was aware of facts that triggered a duty to investigate.

22

The trial court draws another unwarranted inference by noting that Rosas did not share his suspicions about the potential cause of his illness with Dr. Korotzer. There is no evidence Rosas ever misrepresented to any doctor the nature of his work environment. In fact, Rosas testified that he had shared his suspicion with doctors as early as 2003, and Dr. Korotzer's notes refer to a "sand-like dust, which may be sugar molecules." Furthermore, the letters written in 2006 show that his doctors were well aware that his job involved exposure to odors, fumes and chemicals, and Korotzer confirmed that Rosas told him he was exposed to chemicals, odors and fumes at his work site.

In determining when a plaintiff is aware of facts that would lead a reasonable person to suspect an injury was wrongfully caused, we disagree that the onus is placed on the patient to share his subjective suspicions, in the absence of an inquiry from the doctor. If there was evidence that Dr. Korotzer had asked Rosas for a list of the powders and chemicals he worked with, and Rosas did not thereafter provide the doctor with such a list, a legitimate inference could be drawn that a reasonable person would have done so. Instead, Rosas testified Dr. Korotzer never asked him about the chemicals he was exposed to at work. Contrast the facts in this case to those in *Rivas*, where the plaintiff's doctor not only asked the plaintiff about the chemicals he used at work, but then instructed the plaintiff to stay away from a particular solvent suspected of causing his kidney disease, and plaintiff complied. (*Rivas, supra*, 98 Cal.App.4th at p. 223.) In *Rivas*, the appellate court emphasized that the plaintiff's interaction with his doctor, taken alone "should have been sufficient to arouse a reasonable person's suspicion and lead to further investigation." (*Id.* at p. 228.) However, because there was a potential ambiguity based on later doctor's notes stating the etiology of the plaintiff's disease was unknown, the court concluded the statute was triggered once the plaintiff filed a workers' compensation claim based on exposure to toxic chemicals at work, reasoning that such a filing "is definitive proof that he had a suspicion that 'someone ha[d] done something wrong to [him]' long before his civil complaint was filed . . . . (*Jolly* [], *supra*, 44 Cal.3d at p. 1110.)" (*Rivas, supra*, 98 Cal.App.4th at p. 229.) In this case, Rosas produced evidence that neither he nor his doctor definitively suspected a workplace chemical

23

exposure as a cause of his disease. During Dr. Korotzer's deposition, he was asked if he had considered that Rosas's "exposure to chemicals and fumes at work might actually be contributing to his injury or causing his injury?" He responded, "I don't think it was causing his injury. I wish I had figured that out, but—I don't think I did. But I was concerned the chemicals were irritating him and causing his symptoms to be worse."

A rule of law that places on any sick individual the burden of sharing with their doctor any suspicion, whether well formed or not, is not yet embodied in California law, and we are not willing to go that far. Instead, we hold that when a reasonable person would not necessarily suspect wrongdoing, it is not a plaintiff's burden to begin an investigation until the objective facts establish a reason to investigate. (*Nelson, supra*, 142 Cal.App.4th at p. 1206 ["a plaintiff's duty to investigate does not begin until the plaintiff actually has a reason to investigate"].)

Because there are triable issues regarding whether Rosas was aware of the cause of his lung disease and of facts that would lead a reasonable person to suspect a wrongful cause, the court erred in granting summary judgment.

24

## DISPOSITION

The summary judgment entered in favor of respondents is reversed, and costs on appeal are awarded to Rosas.  The matter is remanded for further proceedings.


KRIEGLER, J.

We concur:


TURNER, P. J.


GOODMAN, J.*

---

* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.