Filed 5/30/23; Certified for Publication 6/23/23 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| TRAVIS BLAYLOCK, | |
| Plaintiff and Appellant, | G061301 |
| v. | (Super. Ct. No. 30-2020-01161224) |
| DMP 250 NEWPORT CENTER, LLC et al. | O P I N I O N |
| Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Orange County, Michael J. Strickroth, Judge. Affirmed.

Gusdorff Law, Janet Gusdorff; Russell & Lazarus and Kristopher O'Connell for Plaintiff and Appellant.

Lewis, Brisbois, Bisgaard & Smith, Andres Camacho, Tracy D. Forbath, and Suzanne L. Schmidt for Defendants and Respondents.

\*     \*     \*

The Privette doctrine (*Privette v. Superior Court* (1993) 5 Cal.4th 689 (*Privette*)) limits a property owner's potential liability for on-the-job injuries sustained by employees of an independent contractor. It recognizes that when the owner retains no control over the mode of work, "the work performed was the enterprise of the contractor, who, as a matter of business convenience, would be better able than the person employing the contractor to absorb accident losses incurred in the course of the contracted work." (*Privette,* at p. 693.)

There is an exception to the Privette doctrine's rule of nonliability in cases where "(1) [the property owner] knows or reasonably should know of a concealed, pre-existing hazardous condition on its premises; (2) the contractor does not know and could not reasonably ascertain the condition; and (3) the landowner fails to warn the contractor." (*Kinsman v. Unocal Corp*. (2005) 37 Cal.4th 659, 675,)

Blaylock argues the trial court erred by failing to recognize there is a triable issue of fact about whether DMP 250 Newport Center, LLC, the owner of the premises on which he was injured, and DMP Management, LLC, the owner's property manager (collectively DMP) knew or should have known of the allegedly concealed hazardous condition—an access panel in the floor of the crawl space in which he was working—that he fell through.

We find no error. While the evidence submitted by Blaylock might be sufficient to demonstrate DMP should have known the access panel existed, there was no evidence it knew or should have known the panel was either concealed from a person in the crawl space above, or that it was hazardous. The Kinsman rule is therefore inapplicable.

2

**FACTS**

In June 2018, DMP hired Air Control Systems, Inc. (ACS) to maintain and service its HVAC Equipment. Blaylock was employed as a project manager for ACS. In October 2018, DMP's property manager contacted Blaylock and informed him one of the building's suites was not getting sufficient airflow.

The building's HVAC units are on the roof; they are connected to ductwork that penetrates the roofline into a "plenum" crawl space between the roof and the ceiling of the floor below. In construction terms, the plenum is a separate crawl space between the structural roof joists above and the ceiling joists for the floor which provides room for the building's heating, ventilation, and air-conditioning ductworks. The plenum in DMP's building was about 44 inches tall, and it was accessible through a door on the roof.

The "floor" of the crawl space was constructed of gypsum wallboard panels, taped and mudded at the seams, that covered the ceiling joists below. There were also some plywood panels scattered over the wallboard, but apparently not attached. That wallboard floor did not extend to the area above and around what turned out to be the access panel through which Blaylock fell. From inside the crawl space, the access panel presented as a square plywood surface that sat below the ceiling joists that framed it on all four sides. The wallboard floor also appeared to have been torn away from a small area to one side of the access panel, exposing an additional plywood surface below the joists in that area as well. There was a large metal duct, running vertically, adjacent to the cut-away flooring and the access panel.

One of Blaylock's coworkers testified that ACS trained its employees to check the flooring when working in a crawl space before putting their weight on it because the surface may look deceptive. He noted that employees are also told to move around in a crawl space on all fours to distribute their weight, rather than walking upright, and to "crawl on the beams, the trusses." Approximately one week before

3

Blaylock's injury, that same coworker testified he went into the crawlspace with a flashlight and spent about 15 minutes investigating what needed to be done to make the return air opening sufficient. He said he examined the ductwork; he did not notice any safety concerns, nor did he look for any.

Another of Blaylock's coworkers could not recall specific training regarding working in a crawl space, but explained that "as an A/C technician, you always have to just watch out because one little step and you'll go through the drywall or through the ceiling." An additional coworker testified, "you just want to make sure you're always walking on the two-by-fours."

On the day of Blaylock's accident, ACS employees—including Blaylock and three other men—checked in with DMP's property manager to inform her they were on the premises and were going up to the roof to investigate the problem. The property manager advised Blaylock the HVAC units were on the roof along with the rooftop access point into the crawl space. She directed him to the stairs and provided him with a security code for the door to the roof.

All four men went into the crawl space; Blaylock asked the others to help him count return air grilles to calculate the amount of return air flow. The men remained in the crawl space between 10 and 20 minutes; Blaylock acknowledged moving around the space in a posture that was closer to standing than crawling as he estimated the space was five to six feet tall. The other men stayed entirely or primarily on their hands and knees while in the crawl space. One worker described himself as "crawling around on my hands and knees, kind of like a spider, and . . . then if there's spaces where I could kneel down and just like squat, I would be squatted on a couple of beams." He explained that when moving around on a drywall surface covering the joists "you're always supposed to walk where the drywall is patched up, like, towards the beams. So normally just stay on the edge of the drywall where normally the beams would be."

4

Blaylock used his iPhone as a flashlight, which he described as "'fairly bright,'" as he moved around the space. The crew additionally used their own flashlights plus "three magnetic lights to illuminate the crawl space." Two of the workers described the crawl space as "'pretty well lit'" while they were working.

Blaylock does not remember what happened just before he fell through the access panel. Another worker recalled that seconds before Blaylock fell, everyone had been congregated around a duct shaft, figuring where to cut it, with Blaylock standing on a beam on his "tippy-toes" on one side of the duct while the others sat on the outside edge, when Blaylock "just disappeared." The other workers crawled over to where Blaylock had been, looked down into a hole above a dark closet, and saw Blaylock laying on the floor below. Blaylock had fallen through the access panel into a storage room.

DMP was not involved in the creation of the access panel, did not know when it was constructed, and denied any knowledge of its existence until the accident. There was evidence the panel was visible from below to someone standing in the storage room because it was a different color than the rest of the ceiling and it was surrounded by trim and had an obvious hinge.

Blaylock suffered significant injury as a consequence of the fall. He sued DMP alleging theories of premises liability and negligence.

DMP moved for summary judgment, arguing the undisputed material facts demonstrate that pursuant to *Privette*, DMP owed Blaylock no duty of care in connection with his work for ACS. DMP also argued the access panel was not a concealed hazardous condition, that DMP was not aware of any alleged hazardous condition, and that ACS and its employees could have reasonably discovered the access panel.

In his opposition, Blaylock did not dispute the basic application of *Privette*; instead, he argued there were triable issues of fact concerning whether DMP was nonetheless liable under the hidden hazardous condition exception created by *Kinsman*.

The trial court granted DMP's motion for summary judgment. In its ruling, the court explained that while there is a triable issue of fact about whether DMP employees knew or should have known there was a "hatch door" in the ceiling of the storage room, there was no evidence that any DMP employee knew the hatch could have been an access point to the crawl space, or that it might present a hazard to ACS employees. "[W]hile it is now known the hatch door cannot carry a person's weight, there is no evidence DMP Defendants knew stepping on the hatch door from within the crawlspace would be dangerous. Indeed, there is no evidence the hatch door itself was defective or violated any codes or regulations. There is also no evidence or expert testimony stating DMP Defendants should have been aware of the hatch door and its access to the crawlspace or the danger it presented to Plaintiff and his coworkers. [¶] As Plaintiff cannot show that he can satisfy a required element of the *Kinsman* exception, the Court does not reach the parties' other factual and legal disputes regarding whether Plaintiff should or could have reasonably discovered the allegedly concealed, hazardous condition."

## DISCUSSION

1. *Summary Judgment Standards*

Any party to an action may move for summary judgment. (Code Civ. Proc., § 437c, subd. (a)(1); *Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th 826 (*Aguilar*).) The object of the summary judgment procedure is "to cut through the parties' pleadings" to determine whether trial is necessary to resolve their dispute. (*Id.* at p. 843.)

"[T]he party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact." (*Aguilar, supra*, 25 Cal.4th at p. 850.) "A prima facie showing is one that is sufficient to support the position of the party in question." (*Id.* at p. 851.) A defendant moving for summary judgment may satisfy the initial burden either by producing

6

evidence of a complete defense or by showing the plaintiff's inability to establish a required element of the case. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar*, at p. 853.)

If a moving defendant makes the necessary initial showing, the burden of production shifts to the plaintiff to make a prima facie showing of the existence of a triable issue of material fact. (Code Civ. Proc., § 437c, subd. (p)(2); see *Aguilar, supra*, 25 Cal.4th at p. 850.)

In evaluating the summary judgment motion and opposition, the trial court "must consider all of the evidence and all of the inferences drawn therefrom." (*Aguilar, supra*, 25 Cal.4th at p. 856.) The moving party's evidence is strictly construed, while the opponent's is liberally construed. (*Id.* at p. 843.) All reasonable inferences must be drawn in favor of the opposing party and "summary judgment cannot be granted when the facts are susceptible of more than one reasonable inference . . . ." (*Rosas v. BASF Corp.* (2015) 236 Cal.App.4th 1378, 1392.)

On appeal, we review the grant of summary judgment on a de novo basis. (*Aguilar, supra*, 25 Cal.4th at p. 860.) "We are not limited by the trial court's reasons; even if summary judgment was granted on an incorrect basis, we must affirm if it would have been proper on another ground." (*Barkley v. City of Blue Lake* (1996) 47 Cal.App.4th 309, 313; *Village Nurseries v. Greenbaum* (2002) 101 Cal.App.4th 26, 39.)

2.    *The Kinsman Exception*

In *Privette*, our Supreme Court laid down a general rule exempting landowners from liability for injuries suffered by the employees of independent contractors hired to do work on the premises. The court explained the rule arose from "the recognition that a person who hired an independent contractor had '"no right of control as to the mode of doing the work contracted for."'" [Citations.] The reasoning was that the work performed was the enterprise of the contractor, who, as a matter of business convenience, would be better able than the person employing the contractor to

7

absorb accident losses incurred in the course of the contracted work. This could be done, for instance, by indirectly including the cost of safety precautions and insurance coverage in the contract price." (*Privette, supra*, 5 Cal.4th at p. 693.)

In *Kinsman*, the court considered whether the *Privette* doctrine should extend to a case in which the plaintiff, a former employee of a scaffolding firm, developed mesothelioma from exposure to asbestos at a Unocal refinery in the 1950's. Kinsman "presented evidence that knowledge of asbestos dust as a hazard in the oil industry was well known by the 1950's. In particular, the so-called Bonsib Report prepared by the Standard Oil Company and released in 1937 identified the risks associated with asbestos dust in oil refineries. Kinsman argued that given industry knowledge, Unocal should have warned Kinsman's employer or adopted various safety measures. He produced evidence showing that other oil companies in the 1950's had adopted various safety measures, including better ventilation, plant design, and use of respirators." (*Kinsman, supra*, 37 Cal.4th at p. 665.)

The jury found in favor of Kinsman and Unocal appealed, arguing that unless it exercised control over the contractor's work, it was protected from liability by *Privette*. (*Kinsman, supra*, 37 Cal.4th at p. 666.) The Supreme Court rejected that rule when the hazard that caused the injury was known only to the landowner, and could not have reasonably been discovered by the contractor.

The court explained that pursuant to *Privette*, "the hirer generally delegates to the contractor responsibility for supervising the job, including responsibility for looking after employee safety. When the hirer is also a landowner, part of that delegation includes taking proper precautions to protect against obvious hazards in the workplace. . . . Thus, when there is a known safety hazard on a hirer's premises that can be addressed through reasonable safety precautions on the part of the independent contractor, a corollary of *Privette* and its progeny is that the hirer generally delegates the responsibility to take such precautions to the contractor, and is not liable to the contractor's employee if

the contractor fails to do so." (*Kinsman, supra*, 37 Cal.4th at pp. 673-674.) Moreover, "the responsibility for job safety delegated to independent contractors may and generally does include explicitly or implicitly a limited duty to inspect the premises as well." (*Id.* at p. 677.)

"However, if the hazard is concealed from the contractor, but known to the landowner, the rule must be different. A landowner cannot effectively delegate to the contractor responsibility for the safety of its employees if it fails to disclose critical information needed to fulfill that responsibility, and therefore the landowner would be liable to the contractor's employee if the employee's injury is attributable to an undisclosed hazard." (*Kinsman, supra*, 37 Cal.4th at p. 674.)

The Supreme Court made clear that it is the landowner's knowledge of the hazardous condition, rather than the condition itself, that is relevant: "there is no reason to distinguish conceptually between premises liability based on a hazardous [condition] that is concealed because it is invisible to the contractor and known only to the landowner and premises liability based on a hazardous [condition] that is visible but is known to be hazardous only to the landowner. If the hazard is not reasonably apparent, and is known only to the landowner, it is a concealed hazard, whether or not the [condition] creating the hazard is visible." (*Kinsman, supra*, 37 Cal.4th at p. 678.)

Based on those considerations, the Supreme Court held that a "landowner may be independently liable to the contractor's employee, even if it does not retain control over the work, if: (1) it knows or reasonably should know of a concealed, preexisting hazardous condition on its premises; (2) the contractor does not know and could not reasonably ascertain the condition; and (3) the landowner fails to warn the contractor." (*Kinsman, supra*, 37 Cal.4th at p. 675.)

9

3. *Blaylock's Contentions*

Blaylock argues the trial court erred in granting summary judgment because there are triable issues of fact about whether the access panel—which he describes as a "trap door"—qualified as a hazard which was concealed from people inside the crawl space, and whether DMP should have recognized it represented a hazard to the ACS workers.

Specifically, Blaylock asserts "the trap door cannot be discerned from inside the crawl space" due to the fact its "crawl space side was covered with the same plywood that covered most of the crawl space floor—and was not easily visible in the dim lighting of the crawl space." He further notes that the trap door's hinge was not visible from within the crawl space, and none of the four ACS workers (including Blaylock) recognized it as a trap door.

Blaylock points out the trap door was visible from the storage room below; he argues there was at least a triable issue of fact about whether DMP should have known about the hazard it created. He asserts that although DMP was not involved in the original construction of the building, it had owned the building since 2012, and thus had "controlled the space—and obviously entered it and used it—for the more than six years [before] the date of the accident in October 2018."

There are several flaws in Blaylock's argument.

First, the suggestion that the trap door was concealed because the lighting inside the crawl space was inadequate is not persuasive. As noted *ante*, "when there is a known safety hazard on a hirer's premises that can be addressed through reasonable safety precautions on the part of the independent contractor, a corollary of *Privette* and its progeny is that the hirer generally delegates the responsibility to take such precautions to the contractor, and is not liable to the contractor's employee if the contractor fails to do so." (*Kinsman, supra*, 37 Cal.4th at pp. 673-674.) Inadequate lighting in the crawl space

10

is the kind of known hazard that falls within that rule; it was ACS's responsibility to ensure the workspace was adequately lit to ensure worker safety.

Second, the fact that neither Blaylock nor his coworkers noticed any safety concerns in the crawl space, and none had recognized the panel Blalock fell through as a "trap door," is not sufficient to suggest the trap door was concealed from the perspective of ACS. ACS had a duty to inspect the work premises for potential safety hazards; Blaylock offers no evidence that any such inspection occurred.

The photographs in our record demonstrate that, had ACS employees engaged in a safety inspection of the premises, they would have seen the plywood panel which turned out to be the sealed "trap door" exposed in the crawl space as the wallboard "floor" laid across the top of the joists was cut around it. That recognition might well have revealed the existence of the sealed "trap door."

A reasonable inspection would have also revealed that the exposed plywood surface was attached to the *bottom* of the joists, rather than the top of them. The ACS employees would thus have recognized the plywood functioned as part of the ceiling of the room below, rather than part of the floor of the crawl space.

Third, Blaylock ignores the undisputed evidence which reflected that the ACS employees were trained that when working in a crawl space between the roof of a building and the ceiling of the interior space below, they could not assume the surfaces below them would hold their weight. They were trained to check any flooring before putting their weight on it, to move around on all fours as much as possible to distribute their weight, and to do their best to stay on top of the floor joists (sometimes referred to as the beams or trusses) because stepping onto other surfaces would risk going "through the drywall or through the ceiling."[1]

---

[1]   Blaylock was the only one of the four ACS employees who did not (at least in the record submitted in connection with the summary judgment) explicitly state that he made a point of staying on the floor joists when working in a crawl space, and that he

11

Based on that undisputed evidence, we conclude, as a matter of law, if ACS (i.e., Blaylock and his coworkers) inspected the premises for safety issues, they would have recognized that the access panel which appeared to be part of the ceiling below the joists, was unsafe to walk on.[2]

We consequently reject Blaylock's contention there is a triable issue of fact about whether the plywood panel's status as a "trap door" was concealed from ACS and its employees. Whether or not it could be readily identified as a "trap door," its hazardous nature was not concealed from the workers in the crawl space.

To be clear, we agree with the trial court that there is a triable issue of fact about whether DMP should have known of the access panel's existence because it is visible from inside the storage room that DMP used. But knowing the condition exists is not the same as knowing or suspecting it could create a hazard for ACS employees inspecting the air conditioning. For example, in *Kinsman*, it was undisputed Unocal was aware asbestos was present in the area where Kinsman worked at the Unocal refinery. What was disputed was whether Unocal knew or should have known that asbestos created a hazard for workers like Kinsman. In this case, Blaylock offers no evidence DMP knew or should have known the access panel, which had been screwed shut, was hazardous to the ACS workers.

Blaylock likens this case to *Markley v. Beagle* (1967) 66 Cal.2d 951 (*Markley*), a pre-*Privette* case in which the Supreme Court concluded the evidence was sufficient to demonstrate a landowner knew or should have known that a worker would

---

viewed it as potentially dangerous to step onto ceiling surfaces between the joists. But he did not dispute the point, nor did he claim he believed stepping onto a plywood ceiling between the joists would be safe.

[2] We are not persuaded by Blaylock's assertion that the access panel was not recognizable as a hazard because it was indistinguishable from other plywood "used throughout the crawlspace."

use a warehouse mezzanine to access the roof where he would be working, and knew or should have discovered the mezzanine railing was defective. Blaylock argues that DMP knew or should have known he and his coworkers would use the crawl space to service the air conditioning, and they should have discovered the "trap door concealed in the crawl space but highly visible from [DMP's] offices below." But *Markley* is distinguishable because in that case, the dangerous condition—a defective railing on a mezzanine level inside the premises—was both readily accessible to the property owner and had been caused by the owner's own recent decision to have a different contractor remove the "bins" that previously protected the guard rail. (*Id.* at 955.) Neither of those factors are present here.

Blaylock identifies no evidence which suggests DMP should have known what the access panel looked like from within the crawl space, let alone that its existence might be "concealed" from the viewpoint of a person in that crawl space. Blaylock cites no authority for the implied proposition that a landowner has a duty to inspect crawl spaces before it hires experienced professionals to work within them. Nothing in *Markley* suggests such a duty.

Because Blaylock identified no evidence sufficient to create a triable issue of fact on either (1) the issue of whether DMP knew or reasonably should have known that the access panel constituted a concealed hazard for the ACS workers on its premises, or (2) that ACS could not have reasonably ascertained the hazard, we find no error in the trial court's grant of summary judgment.

13

## DISPOSITION

The judgment is affirmed.  DMP is entitled to its costs on appeal.


GOETHALS, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


SANCHEZ, J.

14

Filed 6/23/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| TRAVIS BLAYLOCK, | |
|    Plaintiff and Appellant, | G061301 |
|      v. | (Super. Ct. No. 30-2020-01161224) |
| DMP 250 NEWPORT CENTER, LLC et al. | O R D E R |
|    Defendants and Respondents. | |

        The Association of Defense Counsel of Northern California and Nevada and the Association of Southern California Defense Counsel have requested that our opinion filed on May 30, 2023, be certified for publication. It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c). The request is GRANTED.

        The opinion is ordered published in the Official Reports.


                              GOETHALS, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


SANCHEZ, J.