Filed 7/31/23  Equitz v. Seaco America CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Siskiyou)

----

| | |
|---|---|
| MICHAEL C. EQUITZ et al., | C093064 |
| Plaintiffs and Appellants, | (Super. Ct. No. SCCV-CVPO-2018-1012) |
| v. | |
| SEACO AMERICA, LLC, et al., | |
| Defendants and Respondents. | |

Michael C. Equitz and Cheryl Equitz (together, appellants) acquired two shipping containers in which to store their belongings and shortly thereafter began suffering various health problems.  Over two years later, after learning the containers were contaminated with toxic substances, appellants sued the company that sold them the containers and two other companies that formerly owned the containers.  Following the companies' motions for summary judgment, the trial court dismissed appellants' claims on the ground that they filed their action too late under the applicable two-year statute of limitations.  The court, applying the delayed discovery rule, found the statute of

1

limitations did not begin to run until appellants suspected or had reason to suspect that their injuries were caused by wrongdoing, but it concluded appellants should have had suspected as much over two years before they filed suit.

On appellants' appeal, we reverse. The applicable statute of limitations here is Code of Civil Procedure[1] section 340.8, subdivision (a). It covers personal injury cases involving toxic exposure and requires a plaintiff to file suit "either two years from the date of injury, or two years after the plaintiff becomes aware of, or reasonably should have become aware of, (1) an injury, (2) the physical cause of the injury, and (3) sufficient facts to put a reasonable person on inquiry notice that the injury was caused or contributed to by the wrongful act of another, whichever occurs later." In this case, all parties accept that appellants were neither aware of the cause of their health problems nor suspected any wrongdoing outside the two-year limitations period. And although a trier of fact could conclude that appellants should have suspected the cause of their ailments and potential wrongdoing over two years before they filed suit, we are not persuaded that a trier of fact would need to reach this conclusion as a matter of law. For that reason, we find summary judgment inappropriate and remand for further proceedings.

BACKGROUND

I

*Factual Background*

In 2015, appellants leased two shipping containers from Tyler Enterprises, Inc. (Tyler), doing business as Medford Mobile Storage. They acquired the first container in March 2015 and the second in April 2015. Seaco America, LLC (Seaco), initially owned the containers but sold them to Dry Box, Inc., in late 2013 and, shortly after, Dry Box sold them to Tyler. At the time appellants acquired the containers, the containers had a

---

[1] Undesignated statutory references are to the Code of Civil Procedure.

2

decal for Medford Mobile Storage and various other decals that had been painted over or otherwise defaced.

Starting around July 2015, appellants used the containers to store their belongings while they built a new home. In September 2015, Michael Equitz contacted Tyler about the containers' smell. Tyler responded that "other people who had leased or purchased shipping containers from them had mentioned a unique smell" and it "recommended to the others that they paint the wood." Michael Equitz concluded the smell likely came from the wood used for the flooring. But appellants decided not to paint the wood, believing they could not modify the containers while leasing them. After the weather turned wet and cold in fall 2015, appellants stopped accessing the containers. At some point that same year, they began to have unspecified health issues. Without providing a date, Michael Equitz said these issues arose "shortly after acquiring" the containers.

Around February 2016, appellants began using the containers again. They purchased the containers shortly after on March 21, 2016, and around the same time, began to suffer various ailments, including coughing, fatigue, and abdominal issues. Appellants attributed their ailments to viral illnesses and old age and sought medical attention. Eventually, after having concerns their health problems might require emergency medical care, appellants abandoned their building plans and relocated to be closer to healthcare providers.

Over the next few months, appellants continued accessing the shipping containers, albeit, on a more limited basis. At some point, appellants noticed the containers "significantly off-gas as the weather got hotter." Later, on a hot day in August 2016, Michael Equitz opened one of the containers and then noticed that the high heat had liquefied an adhesive on the door and exposed a skull and crossbones and the words "Danger, Do Not Enter." He also noticed a defaced decal nearby that included the words "Commercial Fumigation Services" and the remnants of the words "DO NOT ENTER" that, in his view, somebody had scraped off. After seeing this warning, he immediately

3

became concerned that their ailments were attributable to the containers. He later explained, in an October 2016 email to Dry Box, that he discovered the skull and crossbones in early August 2016. But in a later declaration, he offered a specific date: August 18, 2016.

After seeing the skull and crossbones, Michael Equitz hired a company that found the containers were contaminated with numerous toxic substances. Appellants later shared their findings with their healthcare providers. Their providers stated that the containers could have caused their symptoms but found it difficult to pinpoint an exact cause.

## II

### *Procedural Background*

Appellants sued Tyler, Seaco, and Dry Box on August 13, 2018, asserting causes of action for products liability and negligence against all defendants and a cause of action for breach of contract against Tyler. They alleged these companies harmed them by providing storage containers contaminated with methylene chloride.

Following discovery, Seaco moved for summary judgment or, in the alternative, summary adjudication. It argued all appellants' claims were untimely under the applicable two-year statute of limitations, and it further argued appellants' products liability and negligence claims failed for additional reasons irrelevant here. For its argument based on the statute of limitations, Seaco contended appellants' action was untimely because they filed suit over three years after acquiring the containers. It added that, even under the delayed discovery rule, their suit was untimely because they had sufficient facts to suspect the containers caused their injuries over two years before suing. It reasoned that was so because appellants knew their health issues arose shortly after taking possession of the containers in April 2015 and complained of the containers' smell in September 2015.

4

The trial court granted Seaco's motion for summary judgment. Agreeing with the argument that the action was time-barred, it found appellants should have suspected the containers caused their injuries over two years before they sued and, in doing so, the court focused on several considerations. First, it found a reasonable person would have inspected the containers before leasing or buying them and, during an inspection, would have noticed the partially defaced sign about Commercial Fumigation Services. The court added that a person could not possibly enter the containers without seeing this sign. Second, it found appellants developed health problems immediately after using the containers and, after returning to using the containers following a pause in work, again developed health problems. Third, it wrote appellants noticed the containers' smell almost immediately after using them and asked Tyler about the smell in September 2015, which the court believed suggested they suspected their health problems were attributable to the containers. And fourth, it said the containers began to significantly off-gas as the days got hotter, which the court found could be no later than the end of July 2016, as both June and July are hot.

Following the court's ruling, Tyler and Dry Box together filed their own motion for summary judgment or, in the alternative, summary adjudication. They argued the trial court's decision on Seaco's motion applied equally to them and, for reasons irrelevant to this appeal, further argued appellants' claim for breach of contract failed. Agreeing with their first point, the trial court granted their motion for summary judgment.

After the trial court entered two separate judgments in favor of defendants, with one in favor of Seaco and another in favor of Tyler and Dry Box, appellants timely appealed both. This matter was fully briefed on April 12, 2023, and assigned to this panel on April 28, 2023.

5

## DISCUSSION

### I

*Standard of Review*

A trial court may grant a motion for summary judgment "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (§ 437c, subd. (c).) To meet its burden on summary judgment, a moving defendant must show either that one or more elements of the plaintiff's causes of action cannot be established or that there is a complete defense to the plaintiff's case. (*Id.*, subd. (p)(2).) If the defendant meets this initial burden, the burden then shifts to the plaintiff to show that at least one factual issue exists that is both material and triable. (*Ibid.*) A factual issue is material if it could make a difference in the disposition of the motion (Cal. Rules of Court, rule 3.1350(a)(2)), and it is triable if "the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof" (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 845).

" ' " 'We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained.' " ' " (*Hartford Casualty Ins. Co. v. Swift Distribution, Inc.* (2014) 59 Cal.4th 277, 286.) We also " 'liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party.' " (*Ibid.*)

### II

*Statute of Limitations*

Appellants contend the trial court improperly found their action untimely as a matter of law. We agree.

We start with the relevant statute of limitations. All parties agree the relevant statute of limitations is two years, though they cite somewhat different statutes.

Appellants contend the relevant statute is section 340.8; Seaco and Tyler, on the other hand, contend two statutes apply—sections 340.8 and 335.1. We find section 340.8 is the better fit here. Both cited statutes, to be sure, are broad enough to cover the subject matter in this case. Section 335.1 provides a limitations period for "[a]n action for assault, battery, or injury to, or for the death of, an individual caused by the wrongful act or neglect of another." Section 340.8, subdivision (a), in turn, provides a limitations period "[i]n any civil action for injury or illness based upon exposure to a hazardous material or toxic substance." But when multiple overlapping statutes of limitations apply, the "specific statute of limitations takes precedence over [the] general one, even though the latter ' "would be broad enough to include the subject to which the more particular provision relates." ' " (*Vafi v. McCloskey* (2011) 193 Cal.App.4th 874, 880.) Applying that principle, we find section 340.8—the more specific (and more recent) statute— applies here.

Section 340.8, subdivision (a) provides: "In any civil action for injury or illness based upon exposure to a hazardous material or toxic substance, the time for commencement of the action shall be no later than either two years from the date of injury, or two years after the plaintiff becomes aware of, or reasonably should have become aware of, (1) an injury, (2) the physical cause of the injury, and (3) sufficient facts to put a reasonable person on inquiry notice that the injury was caused or contributed to by the wrongful act of another, whichever occurs later." In enacting this text, the Legislature intended to codify the delayed discovery rule for personal injury cases involving toxic exposure. (*Lopez v. Sony Electronics, Inc.* (2018) 5 Cal.5th 627, 633.) It intended, that is, to codify the rule that accrual of a cause of action is postponed "until the plaintiff discovers, or has reason to discover, the cause of action, until, that is, he at least suspects, or has reason to suspect, a factual basis for its elements." (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 389; see also *Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 803 ["under the delayed discovery rule, a cause of action accrues

7

and the statute of limitations begins to run when the plaintiff has reason to suspect an injury and some wrongful cause, unless the plaintiff pleads and proves that a reasonable investigation at that time would not have revealed a factual basis for that particular cause of action"].)

Applying the text of section 340.8 here, we consider whether, as a matter of law and over two years before filing suit, appellants became "aware of, or reasonably should have become aware of, (1) an injury, (2) the physical cause of the injury, and (3) sufficient facts to put a reasonable person on inquiry notice that the injury was caused or contributed to by the wrongful act of another." (§ 340.8, subd. (a).) We conclude the answer is no, focusing on the latter two considerations.

The undisputed facts show that appellants suffered various health problems shortly after acquiring the containers. Cheryl Equitz mentioned "extreme fatigue, balance abnormalities, respiratory issues, unexplained bleeding, depression and PTSD." Michael Equitz, in turn, mentioned various other ailments and associated medical procedures, including peripheral neuropathy (which appears to have affected both appellants), a heart attack, and an abdominal aortic aneurysm surgery. But both appellants initially attributed their health problems to viral illnesses and old age, not any wrongdoing by Seaco, Tyler, or anyone else. They only began to suspect differently, appellants stated, on August 18, 2016, when the heat of a hot day liquefied an adhesive on one of the container's doors and exposed a skull and crossbones and the words "Danger, Do Not Enter." That was less than two years before they filed suit on August 13, 2018.

Although Seaco argued in its motion for summary judgment that appellants should have suspected wrongdoing over two years before they filed suit—and specifically should have suspected the containers—we are not persuaded that this is true as a matter of law. Seaco and the trial court together noted four general reasons for finding appellants should have suspected wrongdoing caused their health problems over two years before filing their action. Seaco focused on two undisputed facts in its motion:

8

(1) appellants acknowledged suffering health issues shortly after taking possession of the containers in April 2015, and (2) they complained of the containers' smell in September 2015. The trial court, in granting Seaco's motion, focused on these types of considerations and two other findings: (1) a reasonable person would have inspected the containers before leasing and buying them and, in the inspection, noticed the decal referencing Commercial Fumigation Services, and (2) the containers began to "significantly off-gas" no later than the end of July 2016.

Although a reasonable jury could find appellants filed their suit too late for these types of reasons, we conclude it could also reach the opposite conclusion after considering the whole of the evidence. Consider first the start of appellants' health problems. Appellants, it is true, acknowledged that "multiple health issues . . . developed shortly after acquiring" the containers. While the trial court equated "shortly after" with "immediately," appellants never clarified what they meant by "shortly after." Minutes after? Days after? Months after? (See *People v. Alford* (2007) 42 Cal.4th 749, 752-753 [using "shortly after" to refer to a period of over two months].) We have no clear answer, other than that their health problems began some time in 2015. And although a reasonable person may have had strong reason to suspect the containers if the health issues began minutes after acquiring the containers, a reasonable person may very well have not suspected the containers if the health issues instead began months after. That is particularly true if, as occurred with appellants here, that person visited doctors about the health issues and was never asked about potential exposure to toxic substances. (Cf. *Rosas v. BASF Corp.* (2015) 236 Cal.App.4th 1378, 1395 ["when a doctor tells a patient his symptoms are normal, and a lung specialist is unable to determine the cause of the patient's lung disease, we cannot conclude as a matter of law that a reasonable person would suspect the disease has a wrongful cause"]; but see *Miller v. Lakeside Village Condominium Assn.* (1991) 1 Cal.App.4th 1611, 1624-1625 [depending on the facts, the absence of a diagnosis will not delay the running of the statute of limitations].)

9

Resolving doubts in favor of appellants, as we must at this stage, we find this consideration provides limited support for the trial court's ruling.

We find similarly for appellants' later bout with health problems in 2016. The facts show that appellants, after a pause in work, returned to using the containers in "approximately February 2016" and later suffered health problems at "approximately the same time" they purchased the containers on March 21, 2016. But the time between February 1, 2016 and March 21, 2016 is nearly two months. And the time here is potentially longer still if you account for the "approximately" qualifier. After all, "approximately" February 2016 may very well concern a date a little before February 2016, and "approximately" March 21, 2016 may, similarly, concern a date a little after March 21, 2016. Here too, then, appellants' health problems in 2016 could have arisen multiple months after their use of the containers, which would have made it harder for appellants to tie their ailments to the containers. And, making the connection to the containers less clear still, we find nothing in the record suggesting that the health problems experienced in 2015 were the same health problems experienced in 2016.

Favoring a different reading of the record, Seaco contends the facts show that appellants experienced health problems in February 2016, not March 2016, and so had more reason to associate their ailments with the containers. But we read the record differently. Both appellants spoke about the onset of their ailments in 2016. Cheryl Equitz was a little vague. She said she spent time in the containers "in February and March 2016 organizing their contents." "At approximately the same time, my husband and I began to suffer from various symptoms of illness." Michael Equitz was more specific. He said: "On March 21, 2016, we purchased the containers from Medford Mobile Storage. [¶] At approximately the same time, my wife and I began to suffer from various symptoms of illness. . . ." Reading this evidence in the light most favorable to appellants, we find they experienced health problems around March 21, 2016.

10

Similar considerations limit the value of the reported off-gassing. In an email in October 2016, Michael Equitz wrote that the containers "started to significantly off-gas as the weather got hotter" in 2016. But when "the weather got hotter" is not entirely clear. We know it was some unspecified time before appellants stopped using the containers in "early August 2016," which appellants acknowledged. But the meaning of "early August 2016" is itself not entirely clear. And to the extent a month is divided into two parts—an early part and a later part—"early August 2016" could mean as late as August 15, 2016. Putting it all together, and construing the evidence in the light most favorable to appellants, we conclude a reasonable trier of fact could find that appellants stopped using the containers on August 15, 2016 and potentially noticed the off-gassing only a moment before—which would be less than two years before appellants filed suit. That might not be the most persuasive reading of the evidence, but it is at least one that a reasonable trier of fact could reach.

Seaco's counterarguments on this topic do not persuade us to find differently. Although Seaco claims the "weather got hotter" statement must refer to "Spring/Summer of 2016" and "it is reasonable to assume . . . before August 2016," that is not a legally required conclusion, even if it is a reasonable one. (See *Rosas v. BASF Corp., supra*, 236 Cal.App.4th at p. 1392 ["summary judgment cannot be granted when the facts are susceptible of more than one reasonable inference"].) And although Seaco claims " 'early' August" must mean the first few days or first week of August, it cites nothing to support this reading, and we are unaware of any universal definition for early in the month. Once more resolving doubts in favor of appellants, and declining to read too much into a few vague words in one email, we take little from Michael Equitz's statement that the containers "started to significantly off-gas as the weather got hotter" in 2016.

Nor are we moved by the remaining two considerations that Seaco and the trial court noted. The first concerns the odors that appellants documented in September 2015;

11

the second concerns the type of inspection that a reasonable person would perform before leasing or buying a shipping container. Starting with the odors, after appellants asked Tyler about the containers' smell in September 2015, Tyler responded that "other people who had leased or purchased shipping containers from them had mentioned a unique smell" and it "recommended to the others that they paint the wood." Tyler thus suggested that the smell was attributable to the floors and is a common issue associated with shipping containers. A reasonable person receiving this response could conclude that the smell, although perhaps annoying, was typical of shipping containers, could be masked if necessary, and was not cause for concern.

Turning to the inspection of a reasonable person, we accept that a reasonable person would have inspected the containers before leasing or buying them. But we conclude a reasonable person might not have found it necessary to inspect all the defaced decals that once covered the containers. These decals might provide, for instance, information about the various entities that formerly owned the containers. But a reasonable person might not find an investigation into this ownership history necessary. And although it is now clear that one of these defaced decals references Commercial Fumigation Services, we are not persuaded that a reasonable person necessarily would have noticed these words. This decal is relatively small (taking up far less than half the space as the decal for Tyler), is defaced (suggesting irrelevance), and is nearly entirely illegible (though, at the bottom, the words "Commercial Fumigation Services" are clear enough on close inspection). Some person, perhaps, might have found it prudent to carefully scrutinize all markings on the containers, including the decal for Commercial Fumigation Services. But we are not persuaded that, as a matter of law, a reasonable person would have done the same.

Nor are we persuaded to find differently by respondents' efforts to bolster the trial court's ruling on appeal. Tyler and Dry Box, to start, repeatedly claim the words "DO NOT ENTER" were visible on the defaced decal for Commercial Fumigation Services.

12

And so, they argue, appellants should have known that dangerous chemicals had previously been applied inside the containers. But the photograph of the decal cuts against their claim. A person carefully inspecting this decal might be able to surmise that the decal once said "DO NOT ENTER" after viewing the decal's remnant markings. But those words are no longer present. Although two letters—an O and an N—are readily visible, the remaining letters are largely (and for the most part, nearly entirely) missing.

Seaco, for its part, raises several additional points. It first claims appellants should have suspected their ailments resulted from wrongdoing, as their symptoms were not, as they initially believed, "general symptoms of 'old age.' " But it cites nothing to show that their symptoms departed from the general symptoms of old age, and we will not simply assume this matter in their favor. Seaco also notes that Michael Equitz acknowledged he had some familiarity with chemicals from his work in the "repair industry" and said he avoids using harmful chemicals. It then asserts that, for these reasons, he should have suspected the containers caused their ailments. That Michael Equitz tried to avoid harmful chemicals and had familiarity with chemicals used in the "repair industry" does not in itself establish that he also had familiarity with chemicals used in the fumigation industry. Nor does it establish that he had reason to second-guess Tyler's suggestion that the containers' odors were typical for shipping containers and associated with their floors.

Lastly, Seaco challenges Michael Equitz's assertion that the high heat on August 18, 2016 caused an area on one of the containers to become exposed, which then revealed the skull and crossbones. Seaco claims "this date is unlikely" because Michael Equitz earlier said the skull and crossbones appeared in "early August," which Seaco believes means the first few days or first week of August. But again, the meaning of "early August" is not as clear as Seaco believes. And although we accept that "early August" is an odd description for a date, like August 18, that is closer to the end than the start of August, we are not persuaded that this shows appellants filed their suit too late.

13

After all, even if the skull and crossbones instead appeared on August 15, 2016—which would be in the earlier half of August—appellants would still have filed their suit within two years of that date.

In short, we reject the trial court's conclusion that, as a matter of law and over two years before filing suit, appellants became "aware of, or reasonably should have become aware of, (1) an injury, (2) the physical cause of the injury, and (3) sufficient facts to put a reasonable person on inquiry notice that the injury was caused or contributed to by the wrongful act of another." (§ 340.8, subd. (a).) The facts show a reasonable person might have inspected the decal noting Commercial Fumigation Services over two years before appellants filed their action. But perhaps not. The facts further show appellants might have noticed significant "off-gassing" over two years before filing suit. But again, perhaps not. And although the facts at least firmly show appellants suffered health problems "shortly after" acquiring the containers and reported the containers' smell in September 2015, the facts also show appellants investigated the potential cause of their health problems when they visited their doctors, received no warning from their doctors that a toxic substance might be contributing to their ailments, and had reason to believe the containers' smell was not cause for concern after speaking with Tyler.

On these facts, to be sure, a reasonable jury could conclude that the statute of limitations began to run over two years before appellants filed suit. But it could also reach the opposite conclusion. We find summary judgment inappropriate here as a result. (See *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1112 ["resolution of the statute of limitations issue is normally a question of fact" and is a question of law only "where the uncontradicted facts established through discovery are susceptible of only one legitimate inference"]; *Nelson v. Indevus Pharmaceuticals, Inc.* (2006) 142 Cal.App.4th 1202, 1210-1211 [rejecting trial court's finding on summary judgment that a plaintiff should have suspected wrongdoing after taking a diet drug and suffering intermittent heart palpitations, fatigue, and dizziness, reasoning that these symptoms did not begin when

14

the plaintiff started the drugs and were too common and non-specific to suggest, as a matter of law, a drug side effect].)

## DISPOSITION

The judgment is reversed.  Appellants are entitled to recover their costs on appeal. (Cal. Rules of Court, rule 8.278(a).)


　　　　　　　　　　　　　　　　 /s/
　　　　　　　　　　　　　　　BOULWARE EURIE, J.



We concur:



　　　 /s/
KRAUSE, Acting P. J.



　　　 /s/
MESIWALA, J.

15